Clara SIMS, et al., Plaintiffs,

W.T. Scott, et al., Plaintiffs–Intervenors,

v.

MONTGOMERY COUNTY
COMMISSION, et al.,
Defendants,

Albert B. Dodson, et al., Defendants–
Intervenors.

Sallie WILLIAMS and Johnie
Love, Plaintiffs,

v.

MONTGOMERY COUNTY SHERIFF'S
DEPARTMENT, et al., Defendants,

Albert B. DODSON, et al., Defendants–
Intervenors.

Civ. A. No. 3708–N, 82–T–717–N.

United States District Court,
M.D. Alabama,
Northern Division.

Dec. 29, 1994.

Wayne Sabel, Montgomery, AL, for Williams/Love Class.

Rick Williams, David G. Flack, Montgomery, AL, for Dodson intervenors.

Thomas T. Gallion, III, Haskell, Slaughter, Young & Johnston, P.A., Montgomery, AL, for sole purpose of responding to M/add party defendants Montgomery Co. Com'n and David Stockman, etc.

Tyrone C. Means, Mark Englehart, Kenneth L. Thomas, Cynthia Clinton, Thomas,

Means & Gillis, P.C., Montgomery, AL, for Montgomery County Com'n.

Delores Boyd, Montgomery, AL (Court-appointed), for named plaintiffs, named intervenors and Sims/Scott Classes.

Sylvester Hardy, pro se.

Alvah Reid, Sr., pro se.

Sally Williams, pro se.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

These two longstanding lawsuits—in which the court previously found that the Montgomery County Sheriff's Department had discriminated against its African–American deputies and its female deputies and applicants—are before the court again, this time on a claim by a group of white male deputies that the department promoted black deputies instead of white deputies to the rank of "law enforcement sergeant" on the basis of race, in violation of federal law.[1] This group, known in this litigation as the "Dodson intervenors," has named the following as defendants: the Montgomery County Sheriff's Department; the Montgomery County Commission; the Montgomery City–County Personnel Board; the Montgomery County Commissioners in their official capacities; and Sheriff Dan Jones and Chief Deputy Calvin Huggins in their official capacities. The Dodson intervenors charge that the defendants violated the following: the fourteenth amendment to the United States Constitution as enforced through 42 U.S.C.A. § 1983; 42 U.S.C.A. § 1981; Title VI of the Civil Rights Act of 1964, as amended 42 U.S.C.A. §§ 2000d through 2000d–4; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17; and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C.A. §§ 3711–3797.[2] The Dodson intervenors have invoked the jurisdiction of the court based on 28 U.S.C.A.

---

1. This group, collectively known as the "Dodson intervenors," consists of Albert B. Dodson, Steven R. Parker, Jon M. Highland, Mark C. Thompson, William H. Mills, Travis A. Parker, Gregory D. Beidleman, Robert L. Ingram, and Robert A. Stone.

2. The Dodson intervenors do not contend that the amendments contained in the Civil Rights of 1991, Pub.L. No. 102–166, 105 Stat. 1071, apply to these proceedings. *See Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Rivers v. Roadway Express, Inc.,* —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).

§ 1343. The defendants have raised a number of defenses, including one that the promotion of the black deputies was required by a valid consent decree.

These two lawsuits are now before the court on motions for summary judgment filed by both the Dodson intervenors and the defendants.[3] The Dodson intervenors have also moved for reconsideration of the denial of their motion to amend their complaint-in-intervention to include individual capacity claims against former Sheriff Mac Sim Butler and Chief Deputy Huggins.[4] For the reasons set forth below, the Dodson intervenors' motions for summary judgment and motion to reconsider will be denied, and the defendants' motions for summary judgment will be granted.

## I. BACKGROUND

### A. Sims *and* Williams *Litigation*

This litigation represents the consolidation of two class action lawsuits: in one, initiated in 1972, a class of black employees sought relief from the Montgomery County Sheriff's Department's racially discriminatory employment practices, *Sims v. Montgomery County Comm'n*, civil action no. 3708–N (M.D.Ala.); and, in the other, filed ten years later, a class of female employees and applicants for employment charged the department with sex discrimination, *Williams v. Montgomery County Sheriff's Dept.*, civil action no. 82–T–717–N (M.D.Ala.).[5]

In the *Sims* litigation in 1973, the court approved and entered a consent decree requiring that the Montgomery County Commission conduct "all hiring and personnel practices, programs and procedures on a non-discriminatory basis without regard to race, color, creed or national origin." Civil action no. 3708–N (M.D.Ala. March 22, 1973) (plan attached at 1, ¶ 1). The 1973 *Sims* decree further provides that, unless approved or "validated" under standards and procedures set out in the decree, a selection procedure can be used only if it did "not have a disproportionate detrimental impact upon minority applicants." *Id.* (plan attached at 6, ¶ 6).[6] The decree provides that "validation"

---

**3.** The defendants have also moved, in the alternative, to strike the Dodson intervenors' jury demand. Because the defendants are entitled to summary judgment, it not necessary that the court reach this alternative issue. Nevertheless, the court notes that, as explained later in this opinion, the Dodson intervenors have sued—and, as a result, may now only sue—the defendants in their official capacities. Because the Dodson intervenors are barred by the eleventh amendment from recovering any monetary relief and thus may pursue only injunctive relief, their claims would not be triable to a jury. *Wilson v. Bailey*, 934 F.2d 301, 305 n. 4 (11th Cir.1991); *Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1187 (11th Cir.1985); *Williams v. City of Montgomery*, 742 F.2d 586, 590 (11th Cir.1984) (per curiam), *cert. denied*, 470 U.S. 1053, 471 U.S. 1005, 105 S.Ct. 1756, 1868, 84 L.Ed.2d 819, 85 L.Ed.2d 161 (1985).

**4.** In 1991, Jones replaced Butler as Sheriff of Montgomery County and, as a result, also replaced him as a defendant in this litigation. *Sims v. Montgomery County Comm'n*, civil action nos. 3708–N & 82–T–717–N (M.D.Ala. June 4, 1991).

**5.** *Williams v. Montgomery County Sheriff's Dept.*, civil action no. 82–T–717–N (M.D.Ala.), was originally brought by Lois Johnson and was, until recently, styled *Johnson v. Montgomery County Sheriff's Dept.* The style changed when Sallie

Williams and Johnie Love replaced Johnson as plaintiffs.

**6.** Paragraph 6 of the plan attached to the order of March 22, 1973, provides as follows:

"The use by Defendants of any employment testing program and the consideration by Defendants of education standards in hiring and promotion decisions shall be discontinued, other than those tests and standards described in paragraph nine hereof, unless and until: (a) a validation study is conducted, pursuant to the *Equal Employment Opportunity Guidelines on Employee Selection Procedure* 35 Federal Register, pp. 12333–12336 (August 1, 1970), which shows that the tests Defendants desire to use accurately predict job performance, and that the education standards relate to the ability of the applicants to do the job; or (b) such tests or standards are approved in writing by the United States Department of Justice, or (c) such tests or standards are approve; by this Court as being valid under applicable Federal law and appropriate professional standards; or (d) such tests or standards do not have a disproportionate detrimental impact upon minority applicants; or (e) such tests or standards are found by the present Chairman of the Department of Psychology of the University of Alabama to relate to ability to perform the job, and this Court, after review of such finding, affirms after hearing that such finding was made in a manner and with a result consistent

shall be based on a "study … conducted, pursuant to the *Equal Employment Opportunity Guidelines on Employee Selection Procedures*, 35 Federal Register, pp. 12333–12336 (August 1, 1970), which shows that the tests Defendants desire to use accurately predict job performance, and that the education standards relate to the ability of the applicants to do the job." *Id.*

Fifteen years later, in 1988, four African–American officers, collectively called the "Scott intervenors," moved to intervene in the *Sims* litigation, charging that the Montgomery County Sheriff's Department was continuing to discriminate against black employees in violation of the 1973 *Sims* decree. The court certified a plaintiff-intervenor class of all "black persons who are past, current, and future employees of the Montgomery County Sheriff's Department." Civil action no. 3708–N (M.D.Ala. Nov. 2, 1988). As a result of this round of litigation, the court on November 27, 1990, entered a permanent injunction prohibiting the department from further racial discrimination and requiring the department to change its personnel procedures. *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1102–03 (M.D.Ala.1990). In an accompanying judgment and injunction, the court required that the department fashion, by an established deadline, new, nondiscriminatory procedures for promotion of non-blacks and blacks. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Nov. 27, 1990).

In the *Williams* litigation in 1983, the court certified a plaintiff class of "all past, present, and future female employees of the Montgomery County Sheriff's Department." *Johnson v. Montgomery County Sheriff's Dept.,* 99 F.R.D. 562, 566 (M.D.Ala.1983). Two years later, in 1985, as a result of this litigation, the court approved and entered a consent decree prohibiting the department from discriminating against its female officers and requiring that it adopt new, nondiscriminatory policies with regard to promotions, transfers, and job and shift assignments. *Johnson v. Montgomery County*

*Sheriff's Dept.,* 604 F.Supp. 1346 (M.D.Ala. 1985). The department agreed to develop promotion procedures that conform with the "1978 Uniform Guidelines [on Employee Selection Procedures,] 29 CFR § 1607 et seq.," *id.* at 1354, and that "would have little or no adverse impact on women seeking to be … promoted to ranking positions." *Id.* The 1985 decree provides that "Adverse impact will be measured by the 'four fifths rule' set forth in § 4(D) of the Uniform Guidelines." *Id.* at 1355.

In 1986, the *Williams* class filed a request for additional relief. In a 1986 supplemental consent decree resolving the request, the department agreed to hire an independent professional consultant, mutually selected by the parties, to develop temporary and eventually permanent promotion procedures for all ranks as required by the 1985 decree. Civil action no. 82–T–717–N, at 5 (M.D.Ala. July 24, 1986). In 1988, the *Williams* class charged that the department was continuing to discriminate against women. As a result of this round of litigation, the court on November 27, 1990, found that the department had discriminated and retaliated against female employees, and entered a permanent injunction prohibiting the department and its officers from engaging in further sexual discrimination and retaliation, and requiring the department to take affirmative and immediate steps to address sexual harassment and discrimination within the department. *Sims,* 766 F.Supp. at 1079–80. In an accompanying judgment and injunction, the court also required that the department fashion, by an established deadline, new, nondiscriminatory procedures for promotion of men and women. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Nov. 27, 1990).

In 1990, the court permitted a group of white male deputies, collectively called the "Dodson intervenors," to intervene in this litigation. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Nov. 27, 1990). In 1992, the court certified the Dodson intervenors as a class for the purpose of challenging pro-

with applicable law and appropriate professional standards; in such hearing, the burden

should be on the party attacking the finding."

motion procedures within the department. *Id.* (May 18, 1992).[7]

In 1992, as required by the court in its judgment and injunction entered on November 27, 1990, the department submitted new, nondiscriminatory interim promotion procedures, and these procedures were approved by the court. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Jan. 13, 1992). In 1994, the department submitted new, nondiscriminatory permanent promotion procedures, and these procedures were approved by the court. *Id.* (M.D.Ala. Dec. 7, 1994).

B. *Challenge to the 1988 Promotions*

The Montgomery County Sheriff's Department is split into two divisions: "law enforcement" and "corrections." The corrections division is responsible for the operation of the Montgomery County Detention Center, also known as the county jail; the law enforcement division is also known as the field division. At issue in the current phase of this litigation are the 1988 promotions to sergeant in the law enforcement division. In August 1986, as required by the 1986 supplemental consent decree in *Williams,* the Montgomery County Commission hired the Center for Business and Economic Development of Auburn University at Montgomery as an independent professional consultant. The Center was instructed to conduct analyses of the various jobs in the Sheriff's Department and to develop selection procedures for those jobs. Under the supervision of the Center's director, Dr. John G. Veres, the Center developed interim selection procedures for various ranks, including law enforcement sergeant, and later developed permanent procedures for each of those ranks. The procedure used for making promotion to sergeant in 1988 was an interim one, used only in that year. The procedure consisted of two components: a multiple-choice written examination and a structured oral interview.

In March 1988, all candidates applying for promotion to law enforcement sergeant met with representatives of the Center and the Montgomery City–County Personnel Board to discuss test-taking strategies and the overall testing process. The Dodson intervenors contend that, at the meeting, they were told that a score of 58 on the written test would move them on to the structured oral interview. They also allege that they were told that the oral interview would form the sole basis for their performance ranking.

On March 26, representatives of the City–County Personnel Board administered the sergeant's written examination. Among the 53 candidates who took the test, there were 40 whites (34 white males and six white females) and 13 blacks (seven black males and six black females). After the examination, the Center recommended that 24 candidates be referred to sit for the structured oral interview: 18 whites (14 white males and four white females) and six blacks (four black males and two black females). Five of the nine Dodson intervenors were referred. One white male candidate who was referred chose to drop out of the selection process, leaving only 23.

The Dodson intervenors allege that the Center's decision to limit to 24 the number of persons to advance to the oral interview was arbitrary. According to Dr. Veres, however, the decision was based on a number of concerns, including security of the interview process if the interviews took more than one day, standardization of questions among interviewers, and limiting the number of interviewees to those with a realistic chance of being promoted. He stated that it was unlikely that a deputy who scored poorly on the written test would score well on the interview or score well enough to surpass others who scored higher on the written examination.

In recommending candidates for the oral interview, the Center did, however, make two separate lists of candidates, one composed of black candidates and one of white candidates. The Center advanced an equal percentage of the highest-ranking candidates by race based on their makeup in the initial pool of applicants. As a result, whites who scored 96 or higher on the written exam were referred for oral interview, and blacks who scored 80 or

---

7. The court found that the intervenors did not have standing to challenge hiring, recruitment, or job assignments in the department. Civil action nos. 3708–N & 82–T–717–N, at 7–8 (M.D.Ala. May 18, 1992).

higher were referred. The Center prepared the separate lists to avoid "adverse impact" on black candidates, which would have resulted if the top 24 scoring candidates on the written examination, who were all whites, had been referred for oral interview.

According to the defendants, this adjustment to avoid adverse racial impact was necessary to comply with the 1973 *Sims* consent decree. In the late spring or early summer of 1987, some of the defendants and their counsel met with Dr. Veres to discuss compliance with the 1985 *Williams* consent decree. One of the attorneys brought to Dr. Veres's attention the existence of the 1973 *Sims* decree; the attorney expressed concern that all promotions be made in compliance with both the *Williams* and the *Sims* decree. Dr. Veres was unaware of the *Sims* decree. As stated, the *Williams* decree required that the department develop promotion procedures that conform with the "1978 Uniform Guidelines [on Employee Selection Procedures,] 29 CFR § 1607 et seq.," *Johnson,* 604 F.Supp. at 1354, and that "would have little or no adverse impact on women seeking to be ... promoted to ranking positions." *Id.* The 1985 decree provides that "Adverse impact will be measured by the 'four fifths rule' set forth in § 4(D) of the Uniform Guidelines." *Id.* at 1355. The Uniform Guidelines provide that selection procedures may be validated based on "criterion-related validity studies, content-related validity studies, or construct-related validity studies." 29 C.F.R. § 1607.5. In contrast, the *Sims* decree provides that, unless approved or "validated" pursuant to the decree, a selection procedure could be used only if it did "not have a disproportionate detrimental impact upon minority applicants." Civil action no. 3708–N (M.D.Ala. March 22, 1973) (plan attached at 6, ¶ 6). The decree further provides that "validation" shall be based on a "study ... conducted, pursuant to the *Equal Employment Opportunity Guidelines on Employee Selection Procedures,* 35 Federal Register, pp. 12333–12336 (August 1, 1970), which shows that the tests Defendants desire to use accurately predict job performance, and that the education standards relate to the ability of the applicants to do the job." *Id.* The decree does not define "disproportionate detrimental impact" or how such impact was to be measured.

In reviewing the *Sims* decree at that time, Dr. Veres was uncertain whether validation studies acceptable under the *Williams* decree would comply with the *Sims* decree as well. Dr. Veres read the 1973 *Sims* decree to require that their selection procedures be validated using only "criterion-related studies," and he believed it problematic, if not impossible, to construct a criterion-related validation study for the 1988 promotion procedures. In addition, even if the *Sims* decree, like the *Williams* decree, could be read to authorize "content-related validity studies," it would be a lengthy and complex process to obtain a judicial finding that their selection procedures were content valid.[8] Dr Veres was also uncertain about the meaning of "disproportionate detrimental impact." The phrase had no meaning in the science of statistics. The defendants contend that, confronted with these unresolved complex legal and factual issues in the face of the department's need for the promotions as soon as possible, their counsel instructed Veres to implement selection procedures that would avoid adverse impact and to use the four-fifths rule as the operational definition for "disproportionate detrimental impact" and "adverse impact" under both decrees.

The structured oral interview was administered to 23 candidates. Based on the candidates' overall performance scores, which represented a weighted average of the combined written examination and oral interview performance score, the Center compiled a rank-order list of candidates recommended to be certified for promotion to sergeant in the law enforcement division. All the white candidates placed higher than the black candidates on the rank-order list.

The Sheriff's Department stated that it desired to promote five persons to sergeant

---

8. Indeed, the court is convinced from the "limited" evidence presented at the 1988–89 trial (which was the basis for the November 27, 1990 opinion) that the procedures could not have been content validated. Moreover, the Dodson intervenors have come forward with no evidence that the procedures could have been validated under any studies.

in the enforcement division. Under the "rule of five"—according to which the number of persons certified to a department for consideration equalled the number of vacancies plus four—the Montgomery City–County Personnel Board was required to refer the top nine ranking candidates to the Sheriff's Department. In order to avoid adverse impact, however, the Center advised the City–County Personnel Board not to certify the top nine candidates. Instead, the Center recommended certification of the top seven white candidates and the top two black candidates. Some white candidates were therefore passed over for lower scoring black candidates. The Sheriff's Department later notified the Center that it had seven sergeant positions to fill. The Center then recommended the certification of eleven candidates, eight whites and three blacks. All eleven candidates were deemed qualified for promotion by the Center.

The decision to recommend eight whites and three blacks arose out of a meeting on October 11, 1988, attended by Dr. Veres and attorneys for all parties then involved in the litigation. At that meeting, counsel asked Dr. Veres how many blacks and how many women the Sheriff's Department would have to promote in order to avoid adverse impact upon both blacks and women, as required by the *Sims* and *Williams* decrees. Dr. Veres advised counsel that, assuming seven promotions were to be made, three blacks and two women would have to be promoted. Dr. Veres performed the four-fifths rule calculations during the meeting. He calculated adverse impact as to the year 1988 only and did not take into account hiring over any previous time period. Dr. Veres later testified, however, that only two blacks needed to be promoted to avoid adverse impact for the year 1988, but that the promotion of three blacks was necessary to avoid adverse impact for the period 1981 through 1988.[9] At the meeting, counsel for the *Williams* class and counsel for the Scott intervenors expressed objections to the proposed promotions. The meeting broke up when it became apparent that all counsel could not agree on the breakdown of the promotions and that the dispute

would have to be submitted to the court for resolution.

After the meeting, counsel for defendants met with Chief Deputy Huggins. They advised him of Dr. Veres's assertion that three black deputies had to be promoted to avoid adverse impact and comply with the *Sims* decree. Chief Deputy Huggins in turn passed Dr. Veres's recommendation on to then-Sheriff Butler. Butler directed Huggins to follow Dr. Veres's recommendation and promote whomever had to be promoted in order to comply with the various decrees.

Sheriff Butler selected four whites (three white males and one white female) and three blacks (two black males and one black female) for promotion to sergeant. The white candidates were the four highest ranked on the list of white candidates, and the black candidates were the three highest on the list of black candidates. The defendants then filed a motion with the court for approval of the promotions. The Scott intervenors opposed the promotions but later withdrew their objection. On December 1, 1988, after a hearing, the court granted the defendants' motion to approve the promotions, and the promotions became effective December 12, 1988. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala.).

## II. MOTIONS FOR SUMMARY JUDGMENT

The Dodson intervenors and the defendants seek summary judgment on the Dodson intervenors' challenge to the 1988 promotions to sergeant. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis of its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v.*

9. At the meeting, Dr. Veres, in fact, calculated that only two blacks had to be promoted for the

year 1988 but, according to defendants, failed to inform anyone of this change from three to two.

*City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the non-movant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or non-movant bears the burden of proof). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### A. *The Dodson Intervenors' Fourteenth Amendment Claims*

■ The court first addresses the merit of the Dodson intervenors' claims based on the equal protection clause of the fourteenth amendment as enforced through § 1983. It is now axiomatic that, absent necessary justification, the fourteenth amendment prohibits governmentally imposed racially and sexually discriminatory classifications. *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). The intervenors' complaint-in-intervention suggested that the 1988 promotions were unlawfully based on both race and sex.

### 1. Sex Discrimination Claim

■ The Dodson intervenors have not pursued their claim of sex discrimination in any of their subsequent pleadings or briefs. They have also failed to present evidence even suggesting that the defendants unlawfully discriminated against them on the basis of sex. Summary judgment is therefore appropriate on the Dodson intervenors' claim of sex discrimination.

### 2. Good Faith Defense

The defendants admit that the 1988 promotions were race-conscious decisions but contend that they cannot be held liable because the promotions were, at worst, a good faith mistake. The defendants attempted to analogize their alleged good faith mistake to the actions of an employer who had discharged an employee contending that the employee's performance was unsatisfactory. The employer may avoid liability if it proves to the factfinder that it had a good faith belief that the employee's performance was unsatisfactory, even if the employer later discovers that it was mistaken. *See, e.g., Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir.1982). The defendants argue that they likewise in good faith believed that the 1973 *Sims* decree required the promotion of three blacks though they may have been mistaken. The defendants' analogy is flawed. In *Moore,* the employer gave a "race-neutral" reason for its employment decision and contended that its race-neutral decision was made in good faith. Here, in contrast, the defendants admit that their employment decision was race conscious. Thus, the good faith reliance referred to in *Moore* does not apply to the 1988 promotions.

The defendants further argue that they did not violate the fourteenth amendment because they did not have any invidious intent to harm white deputies. They contend that an attempt to favor blacks may exist without the intent to harm whites. The Supreme Court has expressly rejected this argument, stating "that equal protection analysis 'is not dependent on the race of those burdened or benefited by a particular classification.' " *Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2829, 125 L.Ed.2d 511 (1993) (quoting *Croson,* 488 U.S. at 494, 109 S.Ct. at 722 (plurality opinion)). The defendants further suggest that their actions were, at worse, "benign." Again, the Supreme Court has rejected such an argument, writing that merely because a "category of . . . racial discrimination" could be viewed as "benign" does not warrant subjecting it to "relaxed judicial review." *Shaw,* —— U.S. at ——, 113 S.Ct. at 2830. Indeed, the Court continued, "the very reason that the Equal Protection Clause demands strict scrutiny of all racial classification is because without it, a court cannot determine whether or not the discrimination truly is 'benign.' " *Id. See also Hicks v. Dothan City Bd. of Educ.,* 814 F.Supp. 1044, 1048 (M.D.Ala.1993) (race-conscious discrimination, albeit perhaps benign, not

permissible by the fourteenth amendment under circumstances presented).

Admittedly, the Fifth, Sixth, and Tenth Circuit Courts of Appeals have held that "a good faith settlement of a claim of past discrimination constitutes a legitimate, nondiscriminatory reason for making employment decisions." *Marcantel v. State of La., Dept. of Transp. & Dev.*, 37 F.3d 197, 202 (5th Cir.1994). *See also Carey v. U.S. Postal Service*, 812 F.2d 621 (10th Cir.1987); *EEOC v. McCall Printing Corp.*, 633 F.2d 1232 (6th Cir.1980). This court declines to rely on the holdings in *Marcantel, Carey,* and *McCall* because, in those cases, the persons whose positions were part of a settlement were purportedly victims of discrimination. Here, in contrast, there is no evidence that the three blacks who were selected over whites for promotion to sergeant in 1988 had themselves been victims of discrimination. Moreover, other equitable considerations not applicable here support the decisions in *Marcantel, Carey,* and *McCall.* To allow employers to be open to claims of discrimination as a result of individual good faith settlements "would subject employers to conflicting obligations." *Marcantel,* 37 F.3d at 200. The "consideration of a conciliation agreement which results in a consent decree as an act of discrimination against employees not benefitted by that agreement would create a situation in which each settlement would spark new rounds of litigation, settlement of claims would be discouraged, and the courts would be continually faced with stale claims." *McCall Printing Corp.,* 633 F.2d at 1238. The Fifth Circuit also stated that its case was not controlled by *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), because, under the settlement, all those eligible "were affected regardless of their race." *Marcantel,* 37 F.3d at 200. Here, in contrast, all those eligible were affected or not affected only because of their race.

3. Standing of the Dodson Intervenors

The Dodson intervenors argue that the defendants incorrectly interpreted the requirements of the 1973 *Sims* decree and, because of this erroneous interpretation, exceeded the scope of the decree in promoting three blacks. The defendants respond that the intervenors lack "standing" to make this argument.

In two recent cases, the Sixth Circuit Court of Appeals rejected an identical argument, holding that persons who were not parties to a consent decree lacked standing to enforce the decree according to their own interpretation of it. In *Vogel v. City of Cincinnati,* 959 F.2d 594 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992), the City of Cincinnati developed an affirmative action hiring policy pursuant to a consent decree. Vogel, a white male police officer, subsequently brought suit against the city, arguing that the city's police department went beyond the consent decree in administering its hiring policy. Vogel argued that the city had implemented a "quota system" by hiring a predetermined percentage of blacks in violation of the consent decree. The Sixth Circuit stated: "In contending that the City had gone beyond the scope of the consent decree in administering its affirmative hiring policy, Vogel, who was not a party to the consent decree, seeks collaterally to enforce it according to his own interpretation of it. We hold that Vogel lacks standing to assert such a claim." 959 F.2d at 598. The court explained that a consent decree, although in effect a final judgment, is a contract founded on the agreement of the parties. *Id.* at 598. The decree should be construed to preserve the position for which the parties, and not others, bargained. *Id.* The decree "represents a compromise between parties who have waived their right to litigation and, in the interest of avoiding the risk and expense of suit, have giv[en] up something they might have won had they proceeded with the litigation." *United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Accordingly, a consent decree "is not enforceable directly or in collateral proceedings by those who are not parties to it." *Vogel,* 959 F.2d at 598 (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750, 95 S.Ct. 1917, 1933, 44 L.Ed.2d 539 (1975)). It "may be challenged only on the ground that its substantive provisions unlawfully infringed upon the rights of the com-

plainant." *Id.* (quoting *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 484 (6th Cir.1985)). Thus, the court held that Vogel did not have standing to challenge the decree according to his interpretation of it but could claim that the decree as it applied to him violated the fourteenth amendment.

Similarly, in *Jansen v. City of Cincinnati,* 977 F.2d 238 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2344, (1993), white applicants for the city's fire department claimed that the implementation of separate hiring lists by race was not authorized by a consent decree and involved the use of impermissible quotas. As in *Vogel,* the appellate court held that the plaintiffs lacked standing to challenge the city's interpretation of the consent decree and to have the decree interpreted upon their own terms. The court stated that the plaintiffs' challenge must be limited to the constitutionality of the decree as it applied to them. *Id.,* at 242.

■ Relying on *Vogel* and *Jansen,* this court agrees with the defendants that, because the Dodson intervenors were not parties to the 1973 consent decree in *Sims,* they lack standing to challenge the defendants' interpretation of the decree and thus to assert that defendants exceeded the scope of the decree. *See Paradise v. Prescott,* 767 F.2d 1514, 1525 (11th Cir.1985) (per curiam) (because a consent decree has many of the attributes of a contract, it should be construed in light of traditional tenets of contract construction), *aff'd on other grounds,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). The Dodson intervenors, however, do have standing to challenge the "legality" of the decree to the extent it affects them.

4. Interpretation of the 1973 *Sims* Decree

As stated above, the interpretation of the 1973 *Sims* decree is not before the court because the Dodson intervenors have no standing to challenge the defendants' interpretation. Nevertheless, because the Eleventh Circuit has yet to address standing in the context presented here, this court will confront the Dodson intervenors' challenge to the defendants' interpretation of the decree.

■ Although a consent decree is essentially a judgment, *Paradise,* 767 F.2d at 1525, it "also has many attributes of a contract between the parties" and thus should be construed in light of the traditional tenets of contract construction, with the "scope of [the] decree ... discerned within its four corners." *Id.* (quoting *Armour & Co.,* 402 U.S. at 682, 91 S.Ct. at 1757); *see also United States v. I.T.T. Continental Baking Co.,* 420 U.S. 223, 233–38, 95 S.Ct. 926, 933–35, 43 L.Ed.2d 148 (1975); *Jacksonville Branch, NAACP v. Duval County School Bd.,* 978 F.2d 1574, 1578 (11th Cir.1992). But, when language in a consent decree is ambiguous, courts may consider extrinsic evidence. *Brewer v. Muscle Shoals Bd. of Educ.,* 790 F.2d 1515, 1519 (11th Cir.1986). Moreover, because a decree is a court order, it follows that one of the most important extrinsic factors to which courts may turn in resolving ambiguity are those equitable considerations that flow from the statutes that underlay the decree.

The 1973 *Sims* decree provides that, unless approved or validated pursuant to the decree, a selection procedure could be used only if it did "not have a disproportionate detrimental impact upon minority applicants." Civil action no. 3708–N (M.D.Ala. March 22, 1973) (plan attached at 6, ¶ 6). The decree, however, does not define "disproportionate detrimental impact" or how such impact was to be measured, and it does not appear that the phrase has an established meaning within the science of statistics. The Dodson intervenors agree that phrase means adverse impact but contend that, under the 1978 *Sims* decree, adverse impact should be measured by "statistical significance"; the intervenors, however, do not specify what method of statistical significance should be used. The phrase is therefore ambiguous.

a. The Four–Fifths Rule

■ The defendants contend that the phrase "disproportionate detrimental impact" should be interpreted to incorporate the 1978 Uniform Guidelines' four-fifths rule. The Dodson intervenors respond that the 1973 *Sims* decree could not have required the four-fifths rule because the rule did not exist

until after 1973 and did not become a part of the Guidelines until 1978; they argue that the decree could only have incorporated the Guidelines as they existed in 1973. The court agrees with the Dodson intervenors that the decree required that adverse impact be measured under the standards set forth in the Guidelines. However, the intervenors' further contention that the court can look only to the Guidelines as they existed in 1973 is essentially meaningless and unhelpful. The Guidelines, as they existed in 1973, refer to "adverse effect" but do not define what the phrase means. 35 Fed.Reg. 12,334 (1970).[10] Therefore, it is still necessary to look elsewhere to determine what the phrase adverse effect means.

The defendants therefore logically suggest that the first place to look would be to whether and how later versions of the Guidelines have fleshed out the phrase. Fortunately, there is a later version of the Guidelines that does just that: the 1978 Guidelines which contain the four-fifths rule.[11] This logical conclusion is reinforced by an important practical consideration: the four-fifths rule is required in the 1985 *Williams* consent decree. Although the *Williams* decree was entered into well after the *Sims* decree, it makes sense that adverse impact under both decrees should be measured by the same standards, if possible. Finally, a closer analysis of the Dodson intervenors' argument reveals another major flaw. The intervenors limit their argument to the determination of adverse impact on blacks. They argue that adverse impact on whites should be determined by the four-fifths rule and that adverse impact on blacks should be determined by statistical significance. This argument is illogical and unfair. The parties to the decree could not have intended that the Guidelines would have one meaning as to blacks and another as to whites.

### b. Time Frame

The next issue in interpreting the decree is what time frame to use in measuring adverse impact. The Dodson intervenors look to only 1988, the year in which the promotions were made. The defendants assert that the period preceding 1988 must also be used to determine adverse impact. The defendants say that they have promotional hiring records only for the period 1981 through 1988, and they have provided these records.

The *Sims* decree has been in effect since 1973 but, as demonstrated in this court's 1990 opinion, *Sims,* 766 F.Supp. at 1081–1103, the defendants engaged in not only delay in implementation of the decree but in gross violations of the decree until 1988. In the opinion, the court described the employment picture of the department prior to the 1988 promotions as follows: "In 1988, 20 years after Butler hired his first African–American officer, the racial make-up of the Sheriff's Department raises a strong suspicion that the department has not truly begun to redress its past discriminatory practices; indeed, the evidence before this court reflects that, in many ways, the department has consciously perpetuated them. In a county that is over 30% black in population, no black person as of 1988 had ever been promoted on the enforcement side of the department; no black officer had ever supervised a white officer in the enforcement division.... In addition, to compound this bleak picture, it appears that blacks are not only restricted to the lowest rank, they are also concentrated in the corrections division of the department, the less prestigious of the department's two divisions. Fifty-nine or 77% of the 76 officers in corrections were black; and only 15 or 19% of 78 officers in enforcement were black." *Id.* at 1085. It therefore follows that the period at issue is, at least, 1973

---

**10.** The 1970 Guidelines provide, in part, as follows:

"The use of any test which adversely affects hiring, promotion, transfer or any other employment or membership opportunity of classes protected by Title VII constitutes discrimination unless: (a) the test has been validated and evidences a high degree of utility as hereinafter described, and (b) the person giving or acting upon the results of the particular test can demonstrate that alternative suitable hiring, transfer or promotion procedures are unavailable for his use."
35 Fed.Reg. 12,334 (1970).

**11.** Indeed, the 1970 Guidelines refer to "differential rejection rates" and thus hint at the four-fifths rule in the 1978 Guidelines. 35 Fed.Reg. 12,334 (1970).

through 1988, the period of transgression. To limit the period of measurement to 1988 would be to reward the defendants for their violations.

This approach of considering delay and violations is not without precedent. In *Paradise v. Prescott,* 585 F.Supp. 72 (M.D.Ala. 1983), this court was confronted with a request by black troopers to enforce the terms of two previously entered consent decrees requiring the Alabama Department of Public Safety to develop promotion procedures that had little or no adverse impact on blacks as measured by the four-fifths rule. In fashioning a remedy, this court examined not only the adverse impact of the one set of promotions at issue but also took into consideration the department's promotional hiring record since it had first been prohibited from discrimination against blacks. *Id.* at 74–76. In affirming this court, the Eleventh Circuit and the Supreme Court agreed with this approach: *Paradise v. Prescott,* 767 F.2d 1514, 1525 (11th Cir.1985) (per curiam); *United States v. Paradise,* 480 U.S. 149, 173, 107 S.Ct. 1053, 1067, 94 L.Ed.2d 203 (1987) (plurality opinion).

■ In any event, in evaluating adverse impact, "time-frame" or "flow" statistics focusing on employment decisions made over a period of time are preferred over "static" or "snapshot" statistics focusing on employment decisions made at a fixed point in time. *See, e.g., Hazelwood School Dist. v. United States,* 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977) *Groves v. Alabama State Bd. of Educ.,* 776 F.Supp. 1518, 1523–29 (M.D.Ala.1991); *see also* Schlei & Grossman, *Employment Discrimination Law,* 1365 (2d ed. 1983) ("Following *Hazelwood,* most courts prefer, if not require, time-frame statistics").

■ Admittedly, the court has before it hard statistical data for only the period 1981 through 1988. This limitation does not, however, prevent the court from considering the entire period from 1973 to 1988. As the Fifth Circuit Court of Appeals has noted, "A plaintiff may use statistical as well as non-statistical evidence in establishing a prima facie case of disparate impact." *Bunch v. Bullard,* 795 F.2d 384, 395 (5th Cir.1986)

(quoting *Page v. U.S. Industries, Inc.,* 726 F.2d 1038, 1053 (5th Cir.1984)). And this non-statistical evidence may include a "pattern of racial discrimination." *Bunch,* 795 F.2d at 395. *See also Groves,* 776 F.Supp. at 1529 (although the parties were not able "to fashion a perfect statistical picture, and, indeed, it appear[ed] that the task may be impossible," the court considered non-statistical circumstantial evidence to support finding of "substantial adverse racial impact"); *cf.* Question 21 of the Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines, 44 Fed.Reg. 11,999 (March 2, 1979) (a small sample will support a finding of adverse impact "if a lower selection rate continued over a period of time, so as to constitute a pattern"). Moreover, it is not without significance that the court is without data for the period 1973 through 1981 because the defendants failed to keep such data—data that, from the evidence presented in support of the 1990 opinion, would more than likely have been very incriminating. The already victimized blacks in the Sheriff's Department should not be further disadvantaged because of the defendants' actions or lack thereof. *Cf.* 29 C.F.R. § 1607.4(D) ("Where the user has not maintained data on adverse impact as required by the documentation section of applicable guidelines, the Federal enforcement agencies may draw an inference of adverse impact of the selection process from the failure of the user to maintain such data, if the user has an underutilization of a group in the job category, as compared to the group's representation in the relevant labor market or, in the case of jobs filled from within, the applicable work force").

### 5. Application of the Four–Fifths Rule

■ In applying the four-fifths rule and in looking at adverse impact for the period before and including 1988, the defendants argue that the 1973 *Sims* decree required that they promote three blacks in the enforcement division. The Dodson intervenors argue that it was necessary to promote only one or two blacks to avoid adverse impact under the decree. The court agrees with the defendants. If only two blacks and 13 whites

had been promoted, the promotion rate for blacks would have been 79.4% of the promotion rate for whites.[12] Although this number is very close to 80%, the number fails to take into account the full "time frame," that is, the full and bleak picture of the department's employment history all the way back to 1973. The circumstantial evidence as recounted in the court's 1990 opinion for the entire period 1973 through 1988 and the direct statistical evidence for the period 1981 through 1988 provide a strong basis to conclude that for the entire period 1973 through 1988—during which no blacks were promoted or transferred to any supervisory position in the enforcement division—the promotions to sergeant within the department have had a substantial adverse impact on blacks. *Groves,* 776 F.Supp. at 1529 (although the parties were not able "to fashion a perfect statistical picture, and, indeed, it appear[ed] that the task may be impossible," the court concluded from circumstantial evidence that there was "substantial adverse racial impact"). "Indeed, to reach any other conclusion the court would have to close its eyes to the obvious." *Id.*

More importantly, the court must consider that the pool of black applicants for promotion to sergeant was severely constricted by the defendants' discrimination against blacks in hiring and transfers in violation of the law and the 1973 *Sims* decree itself. *See United States v. Paradise,* 480 U.S. at 168, 107 S.Ct. at 1067 (plurality); *Stuart v. Roache,* 951 F.2d 446, 452 (1st Cir.1991); *see also* 29 C.F.R. § 1607.4(D) ("Smaller differences in selection rate may nevertheless constitute adverse impact ... where a user's actions have discouraged applicants disproportionately on grounds of race"). As the Supreme Court explained in *Paradise,* "Discrimination at the entry level necessarily precluded blacks from competing for promotions, and results in a departmental hierarchy dominated exclusively by non minorities." 480 U.S. at 168, 107 S.Ct. at 1065 (plurality). *See also Ensley Branch,*

*NAACP v. Seibels,* 31 F.3d 1548, 1564 (11th Cir.1994) ("The Board's discrimination against blacks seeking entry-level police and firefighter jobs made it almost inevitable that the effects of discrimination had worked their way up to taint City and Board promotional positions, too"). The promotions to sergeant were made only from those persons who were already officers. Because of the defendants' discrimination in hiring and transfers, there were few blacks eligible for promotion. Therefore, any method of measuring adverse impact that was based on the number of applicants would have inaccurately reflected the history of discrimination.

■ Finally, the court must comment that, although the numbers here are relatively small, a finding of adverse impact is still appropriate. Admittedly, in general, a sample size may be too small to support a determination of whether there is adverse impact. Question 21 of the Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines, 44 Fed.Reg. 11,999. (March 2, 1979). A small sample will support a finding of adverse impact, however, "if a lower selection rate continued over a period of time, so as to constitute a pattern." *Id.* In other words, as the Fifth Circuit has explained, " '[T]he limited size of the population in question [does not preclude us] from recognizing a decisive pattern emerging from a history of experiences.' " *Bunch,* 795 F.2d at 395 (quoting *Rivera v. City of Wichita Falls,* 665 F.2d 531, 536 n. 7 (5th Cir.1982). Here, the racial pattern is self-evident: for 15 years, between 1973 and 1988, the department promoted and transferred *no* blacks to any supervisory position in the enforcement division. *Sims,* 766 F.Supp. at 1085.

The court therefore agrees with the defendants that, in light of the above factors, any doubts as to whether the close figure of 79.4% constitutes adverse impact against blacks should be resolved in favor of such a finding. As stated, this figure does not take

---

**12.** The court used the following numbers in calculating adverse impact. From 1981 through 1988, there were 155 white and 30 black applicants for the position of sergeant in the enforcement division. If two blacks and 13 whites had

been promoted, the promotion rate for blacks would have been 6.666% and the promotion rate for whites would have been 8.387%, with an adverse impact on blacks of 79.487.

into account the number of blacks who would have applied for promotion had defendants not discriminated in hiring, nor does it take into consideration the defendants' actual discrimination in promotions and transfers.

### 6. The Dodson Intervenors' Contention that the 1988 Promotions Were Not Based on the 1973 *Sims* Decree

■ The Dodson intervenors claim that, regardless of what the 1973 *Sims* decree required, the defendants' decision to promote three blacks was not based on the requirements of the decree. Instead, according to the intervenors, the defendants were trying to avoid a finding in the then-pending round of litigation in 1988 that they had discriminated on the basis of race. The court rejects the Dodson intervenors' claim for two reasons. First of all, because the defendants were required to comply with the *Sims* decree in the manner that they did and because, as explained below, the decree is legal, it is immaterial what their motive was. And second, even if the defendants took the action that they did in an effort to redress past discrimination against blacks independent of the 1973 *Sims* decree—or, as the Dodson intervenors would characterize it, to avoid a judicial finding of discrimination—their action, as explained below, is still legal.

### 7. Constitutionality of the 1988 Promotions

The Dodson intervenors have explicitly stated that they do not challenge the constitutionality of the 1973 *Sims* decree. They asserted the following in one of their briefs: "Defendants argue that the Consent Decrees are constitutional. The Dodson Intervenors agree." [13] However, after the defendants asserted that the Dodson intervenors lacked standing to challenge the interpretation of the consent decree, the intervenors changed their position and argued that the defendants' "interpretation" of the decree is unconstitutional. In addressing the issue of the legality of the defendants' actions, however, the court need not split hairs between whether the Dodson intervenors are challenging the constitutionality of the decree, or its interpretation, or both, and the court need not try to determine whether the defendants were acting pursuant to the 1973 decree or not: the bottom line is whether the 1988 promotions were legal. The court must determine whether the race-conscious decision of the Sheriff's Department to appoint three black officers as sergeant was legal under the equal protection clause of the fourteenth amendment.

■ Under the equal protection clause, this court must apply "strict scrutiny" to race-conscious relief voluntarily implemented by a public employer, irrespective of whether the relief is embodied in merely a personnel decision or in a consent decree. *In re Birmingham Reverse Discrimination Emp. Lit.*, 20 F.3d 1525, 1534 (11th Cir.1994); *Shuford v. Alabama State Bd. of Educ.*, 846 F.Supp. 1511, 1520 (M.D.Ala.1994); *see also Croson*, 488 U.S. at 503, 506, 109 S.Ct. at 727, 728 (majority opinion applies strict scrutiny); *Peightal v. Metro. Dade County*, 26 F.3d 1545, 1552 (11th Cir.1994). The "purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the [defendant] is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493, 109 S.Ct. at 721. Thus, there are two prongs to the strict scrutiny analysis: first, "any racial classification 'must be justified by a compelling governmental interest,'" and, second, "the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.'" *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 285, 106 S.Ct. 1842, 1852, 90 L.Ed.2d 260 (1986) (plurality opinion) (citations omitted); *see also Seibels*, 31 F.3d at 1564; *Peightal*, 26 F.3d at 1552–53.

Importantly, the Supreme Court has indicated that the government "unquestionably has a compelling interest in remedying past and present discrimination." *Paradise*, 480

---

**13.** The Dodson intervenors' amended response to the defendants' motion for summary judgment, filed November 24, 1992, at 14.

U.S. at 167, 107 S.Ct. at 1064 (plurality opinion); *see also Seibels,* 31 F.3d at 1565; *Peightal,* 26 F.3d at 1552. The race-conscious relief before the court, therefore, is "lawful if it represents a 'narrowly tailored' effort to remedy past ... discrimination" against African–Americans in the Montgomery County Sheriff's Department. *Stuart v. Roache,* 951 F.2d 446, 449 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992).

a. Compelling Governmental Interest

■ Whether race-conscious relief serves a remedial purpose with respect to past discrimination is an evidentiary issue. *Seibels,* 31 F.3d at 1565; *Peightal,* 26 F.3d at 1553. The court need not make "formal findings" of discrimination; rather, there must be a "strong basis in evidence" for the conclusion that the consent decree or voluntary action remedies past discrimination. *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849; *see also Peightal,* 26 F.3d at 1553; *Shuford,* 846 F.Supp. at 1521. Here, however, there is not only a strong basis in evidence that remedial action was necessary but contemporaneous findings by this court of the defendants' discrimination against blacks. Indeed, the Dodson intervenors themselves point to the egregious past history of discrimination by the defendants: "Dodson Intervenors agree that Defendants Sheriff and Chief Deputy Sheriff for fifteen years [between 1973 and 1988] consciously discriminated against African–Americans in violation of the court Order and Consent Decree in every aspect." [14]

*Background history of race discrimination in the Sheriff's Department.* In its 1990 opinion, the court found that the Montgomery County Sheriff's Department "hired [its] first African–American officer in 1968." *Sims,* 766 F.Supp. at 1085. "Before then," the court continued, "the Sheriff's Department refused to hire black persons solely because they were black." *Id.* The department did, however, "recruit a number of blacks to serve as 'special' deputies to assist with 'black social functions'; [the department] also used these 'special deputies,' in the mid–60's during the height of the 'civil

rights movement,' to assist in handling civil rights disorders. These black deputies, who were recruited merely because they were black, were mere volunteers and not employees of the department." *Id.*

The court further found that, "In 1988, twenty years after [the department] hired [its] first African–American officer," it had "consciously perpetuated" its "past discriminatory practices." *Sims,* 766 F.Supp. at 1085. The court explained: "In a county that is over 30% black in population, no black person as of 1988 had ever been promoted on the enforcement side of the department; no black officer had ever supervised a white officer in the enforcement division. Moreover, only five persons have been promoted on the corrections side. In addition, to compound this bleak picture, it appears that blacks are not only restricted to the lowest rank, they are also concentrated in the corrections division of the department, the less prestigious of the department's two divisions. Fifty-nine or 77% of the 76 officers in corrections were black; and only 15 or 19% of 78 officers in enforcement were black." *Id.*

*Racial assignment of officers to cars and neighborhoods.* The court found that "The department has ... consciously perpetuated its discriminatory policies of the past and continued to treat black officers as only 'special' officers, restricted mainly to dealing with black people, and not as full-fledged law enforcement officers for *all* the people of the county, both black and white." *Sims,* 766 F.Supp. at 1086 (emphasis in original). The court explained that, "Beginning with the first African–American deputy in 1968 and up until the initiation of this litigation in 1988, the department has in general assigned black officers to serve as car partners with only black officers, and white officers to serve as car partners with white officers," and that, "The department has in general also assigned black officers to work in the predominately black west side of the City of Montgomery and white officers to the predominately white east side." *Id.* at 1085–86. Moreover, the court continued, "in those limited instances where the departmental offi-

14. *Id.*

cials have reluctantly assigned black officers to ride with white officers, they have made known that it would be particularly objectionable for white female officers to ride with black male officers; the same strong objection was not voiced for black females riding with white males." *Id.* at 1086.

*Individual claims of racially disparate treatment.* The court described how "W.P. Scott was denied a transfer to the investigation unit for racially retaliatory reasons; how Melvin Turner was denied a promotion to captain in 1983 and in 1987 because of his race; how Turner was also denied a transfer to the more prestigious enforcement division in 1987 because of his race; how Addie Berry was denied temporary duty as head of the court security unit in 1987 because of her race; and how the department refused to accommodate Cinda Brown's pregnancy because of her race." *Sims,* 766 F.Supp. at 1098. The court also found that Stoney Davis was denied employment in corrections because he is black. *Id.* The evidence also reflected that black officers were disciplined and were more harshly punished because of their race. *Id.* The court found that "officials of the Sheriff's Department have engaged in a pattern and practice of discriminating against black officers in four major areas of personnel action: discipline, promotions, transfers, and job assignments." *Id.* at 1097.

*Racial harassment.* The court found "that racial harassment in the Montgomery County Sheriff's Department has permeated all ranks, from the lowest level corrections officers and deputy sheriffs to the sheriff himself, and is so pervasive and severe as to render the working conditions in the department psychologically intolerable for black officers." *Sims,* 766 F.Supp. at 1092. The court explained that when the department began to hire black officers in the late 60's and early 70's, the terms "nigger," "black nigger," "red nigger," and "apes" were common, and that "one of those who regularly referred to black persons as 'niggers' was [the sheriff] himself." *Id.* at 1093. The court further explained that, "Although the use of the term 'nigger' in the department has declined over the years, it is still used

often enough to perpetuate this atmosphere." *Id.*

 Thus, there was more than a strong basis in evidence that the remedial action by the defendants served a compelling purpose. The court found not only a statistical imbalance but that the defendants had intentionally discriminated against blacks in hiring and promotion, and especially in the enforcement division. The discrimination continued through the time of the 1988 promotions. Accordingly, the defendants have shown a compelling governmental purpose for the 1988 promotions, whether the promotions are reviewed as required by the consent decree or simply as a voluntary action.

#### b. Narrowly Tailored

 The Supreme Court has set forth several factors to determine whether race-conscious relief is narrowly tailored: the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of relief on the rights of third parties. *Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066 (citations omitted) (plurality opinion); *see also Peightal,* 26 F.3d at 1557; *Shuford,* 846 F.Supp. at 1528.

*Flexibility and duration.* The flexibility and short duration of the promotional relief cannot be questioned. The promotion of the three blacks was a one-time interim measure used only until validated testing procedures could be put in place. *See Paradise,* 480 U.S. at 185–86, 107 S.Ct. at 1074 (plurality opinion) (approving one-time imposition of race-conscious promotions until valid promotion procedures could be developed and implemented); *Seibels,* 31 F.3d at 1571 ("An end to racial discrimination demands the development of valid, non-discriminatory selection procedures to replace race-conscious selection procedures"). Indeed, the court has now approved valid, nondiscriminatory permanent promotion procedures for the department. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Dec. 7, 1994). *Contrast Seibels,* 31 F.3d at 1571 ("Although the decree ordered the Board to comply with Title VII by

developing valid tests, it provided no deadlines or formal review mechanism to ensure that the Board actually did so. That omission turned out to be a serious flaw").

*Over- and under-inclusiveness.* The 1988 promotions were neither over-inclusive nor under-inclusive. The promotions applied only to those who were qualified for promotion within the department. *See Paradise,* 480 U.S. at 177–78, 107 S.Ct. at 1070 (plurality) (relief was appropriate where only qualified applicants were promoted and where employer not obligated to make unnecessary or gratuitous promotions). All of the blacks who were promoted were considered qualified pursuant to the written examination and oral interviews given to all applicants for the 1988 promotions. There are no claims that the promotions were under-inclusive.

*Efficacy of alternative remedies.* The consent decree prevented the Sheriff's Department from making only those promotions that would have an adverse impact on blacks. The decree therefore did not limit the department to using any particular method for promoting officers. The Dodson intervenors do not offer alternative remedies except to argue that promoting one or two black officers instead of three would have sufficed. As the court has found, however, the defendants had never promoted a single black to sergeant in the enforcement division, even in the 15 years after the 1973 *Sims* decree took effect. Alternative remedies had therefore not succeeded.[15] The promotion of three blacks was the only way to ensure that blacks received the full relief necessary to remove the vestiges of discrimination, and especially in light of the 15–year delay.

*Effect of remedy on intervenors.* The decree did not prevent whites from being promoted to sergeant in enforcement but merely limited the number of whites who were promoted in 1988. In fact, four of the named Dodson intervenors—Robert A. Stone, William H. Mills, Mark C. Thompson, and Steven R. Parker—were promoted to sergeant

in 1991. The promotions did not cause the layoff of any white officers and merely delayed their opportunity for advancement. In addition, the promotions were not intended to set employment percentage goals or ensure a racially balanced work force. *In re Birmingham Reverse Discrimination Emp. Lit.,* 20 F.3d at 1547. After the one set of promotions was made, the defendants proceeded to promulgate promotional procedures that would not be race-conscious. Indeed, as stated, valid, nondiscriminatory permanent promotion procedures have been approved for the department. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Dec. 7, 1994).

Accordingly, the court finds the 1988 promotions were narrowly tailored to meet a compelling governmental interest.

c. Emergency Stop–Gap Measure

In *Local 28 of Sheet Metal Workers' International Association v. EEOC,* 478 U.S. 421, 450, 106 S.Ct. 3019, 3036, 92 L.Ed.2d 344 (1986), the Supreme court explained that, in some circumstances, "affirmative race-conscious relief may be the only means available." "[A] district court may find it necessary," the Court continued, "to order interim hiring or promotional goals pending the development of nondiscriminatory hiring or promotion procedures. In these cases, the use of numerical goals provides a compromise between two unacceptable alternatives: an outright ban on hiring or promotions, or continued use of a discriminatory selection procedure." *Id.* at 450–51, 106 S.Ct. at 3037.

 Here, the Sheriff's Department could not continue to promote under past racially discriminatory procedures; nor could the department utilize exclusively the selection procedures fashioned for the 1988 promotions, for those procedures had not been validated—and it appears could not have been validated at all and definitely not in time of the promotions—and would have resulted in adverse racial impact, in violation of the 1973 *Sims* decree; nor could the court ban all promotions, a result which would not

---

15. Admittedly, the 1973 *Sims* decree included a provision requiring the defendants to "promulgate and institute a recruiting program designed to inform blacks" of certain job opportunities.

Civil action no. 3708–N (M.D.Ala. March 22, 1973) (plan attached at 6, ¶ 5). However, it is apparent from the court's 1990 opinion that this provision was ineffectual.

only cripple the enforcement efforts of the department but would again victimize blacks in the department by continuing to deny them the opportunity for advancement.[16] The court was, therefore, left with no other choice. The 1988 promotions were an "emergency stop-gap measure," *United States v. City of Montgomery*, 731 F.Supp. 436, 437 (M.D.Ala.1989), *aff'd*, 900 F.2d 265 (11th Cir. 1990) (table); *see also United States v. City of Montgomery*, 744 F.Supp. 1089, 1091 (M.D.Ala.1990), necessary because the department needed to make promotions immediately, and because it would be unfair to the department and its officers to require that they wait until a permanent system could be developed, one that would fully and adequately remedy the discriminatory flaws in the prior system. The 1988 promotions allowed the department to continue with promotions without perpetuating the history of race discrimination that led to the findings of the court in its 1990 opinion.

## B. *The Dodson Intervenors' Other Claims*

■ The court now turns to the other claims asserted by the Dodson intervenors. In addition to claims under the equal protection clause, the Dodson intervenors assert claims under 42 U.S.C.A. § 1981; Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000d through 2000d–4; Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17; and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C.A. §§ 3711–3797. Because the court has found as a matter of law that the 1988 promotions did not violate the equal protection clause under a strict scrutiny standard, it follows that the promotions did not violate § 1981, Title VI, Title VII, or the Omnibus Crime Control and Safe Streets Act of 1968, all of which contain the same or lesser standards. *See, e.g., Johnson v. Transportation Agency*, 480 U.S. 616, 627 n. 6, 107 S.Ct. 1442, 1449 n. 6, 94 L.Ed.2d 615 (1987); *United States v. Commonwealth of*

*Virginia*, 620 F.2d 1018, 1024 (4th Cir.1980). In the interest of providing a complete record should there be an appeal, however, the court will address some of the issues presented by these statutes as well.

### 1. Section 1981 Claim

■ The Supreme Court has held that promotion claims are not actionable under § 1981 unless "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer" or "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." *Patterson v. McLean Credit Union*, 491 U.S. 164, 185, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989).[17] The Dodson intervenors have not presented any evidence as to the difference between deputy sheriff and sergeant positions in the enforcement division. The intervenors' only contention is that under the employment merit systems in Montgomery County and the State of Alabama, employees obtain certain legal rights with a promotion in rank and that certain procedures must be followed before the employee can be removed from the rank. This feature of the merit system does not, by itself, constitute sufficient evidence that a promotion to sergeant forms a new and distinct relationship between the officer and the Sheriff's Department.

The court's holding today is limited, however, and should not be understood as a definitive holding that a promotion from deputy sheriff to sergeant would not fall within § 1981's coverage, *see Nunez v. First Nat'l Bank of Florida*, 996 F.2d 287, 289 (11th Cir.1993); *Jones v. Firestone Tire and Rubber Co.*, 977 F.2d 527, 536–37 (11th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 2932, 124 L.Ed.2d 682 (1993); the court merely holds that the Dodson intervenors have failed to come forward with any colorable evidence

---

**16.** As stated, Dr. Veres was uncertain whether validation studies acceptable under the *Williams* decree would comply with the *Sims* decree as well. In addition, even if the *Sims* decree, like the *Williams* decree, could be read to authorize "content-related validity studies," it would be a lengthy and complex process to obtain a judicial

finding that their selection procedures were content valid. *See also supra* note 8.

**17.** As stated, the Dodson intervenors do not contend that the amendments contained in the Civil Rights Act of 1991 apply to their § 1981 claim.

that such a promotion should fall within the statute's coverage. The defendants are therefore entitled to summary judgment on the Dodson intervenors' § 1981 claim.

### 2. Title VI Claim

■ The Dodson intervenors have also alleged a violation of Title VI, which prohibits discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C.A. § 2000d. The Dodson intervenors contend in their brief that the federal forfeiture laws provide funding to the Sheriff's Department. They, however, have presented no evidence to support this claim. The defendants are therefore entitled to summary judgment on the Dodson intervenors' Title VI claim.

### 3. Title VII Claim

■ The defendants contend that, in order to pursue a Title VII claim, at least one of the Dodson intervenors was required to file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), 42 U.S.C.A. § 2000e–5(e), and receive a notice-of-right-to-sue letter before filing suit, 42 U.S.C.A. § 2000e–5(f)(1). *See Jackson v. Seaboard Coast Line R.R. Co.,* 678 F.2d 992, 1010 (11th Cir.1982). The defendants argue that the Dodson intervenors' failure to satisfy these conditions bars their Title VII claim. The Dodson intervenors respond that, in allowing them to intervene, the court placed them in a defendant status and that, as defendants, they are not required to exhaust administrative remedies. Simply being called a defendant, however, does not excuse a party from satisfying Title VII's conditions when a party seeks relief under Title VII. The determinative issue is not the party's nomenclature but that the party seeks relief under Title VII.

■ The Dodson intervenors also contend that they are necessary parties under Rule 19 of the Federal Rules of Civil Procedure and therefore may intervene in this litigation without first exhausting administrative remedies. A party's right to intervene, however, does not bear upon the purpose of Title VII's EEOC charge requirement, which is " 'that the settlement of grievances be first attempted through the office of the EEOC.' "

*Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 450 (11th Cir.1993) (quoting *Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 498 (5th Cir.1968)). The mere fact that a party is a necessary party does not, by itself, excuse the party from Title VII's conditions.

■ However, an intervenor who has not filed an EEOC charge may rely on another party's charge, referred to as the "single-filing rule," provided two requirements are met: first, the relied upon charge is valid; and, second, the individual claims of the filing and non-filing parties "must have arisen out of similar discriminatory treatment in the same time frame." *Calloway,* 986 F.2d at 449; *see also Wheeler v. American Home Products Corp.,* 582 F.2d 891, 897–98 (5th Cir.1977) (extending single-filing rule to intervenors). The Dodson intervenors do not meet the second requirement. Their claim did not arise out of discriminatory treatment similar to either that of the original class of plaintiffs or the Scott intervenors. In fact, the claim of the Dodson intervenors—that they were discriminated against because they are white—is antagonistic to the claims of the plaintiffs and the Scott intervenors, who claimed they were discriminated against because they are black. The defendants are therefore entitled to summary judgment on the Dodson intervenors' Title VII claim.

### 4. Omnibus Crime Control and Safe Streets Act of 1968 Claim

■ The Omnibus Crime Control and Safe Streets Act of 1968 prohibits discrimination in employment by any program or activity funded by the Act. 42 U.S.C.A. § 3789d(c)(1). Any aggrieved person may institute a civil action "after exhaustion of administrative remedies," which involves filing an administrative complaint with the Office of Justice Programs or any other administrative enforcement agency. 42 U.S.C.A. § 3789d(c)(4)(A). The defendants contend that the Dodson intervenors have not pleaded or presented any evidence that the defendants received any funds under the Act or that the intervenors exhausted the required

administrative remedies. *See Nash v. City of Oakwood,* 541 F.Supp. 220, 223 (S.D.Ohio 1982). The Dodson intervenors have not responded to the defendants' contentions. The defendants are therefore entitled to summary judgment on the intervenors' claim under the Omnibus Crime Control and Safe Streets Act of 1968.

### C. *The Defendants' Defenses*

The defendants have asserted various defenses to the Dodson intervenors' claims.

#### 1. Punitive Damages

The Dodson intervenors concede that, unless they can sue some of the defendants in their individual capacities—an issue which is discussed later—their request for punitive damages should be stricken. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981); *Davis v. Alabama State Univ.,* 613 F.Supp. 134, 140 (M.D.Ala.1985). The defendants are therefore entitled to summary judgment to the extent the Dodson intervenors seek punitive damages from them in their official capacities.

#### 2. Eleventh Amendment Immunity

The Dodson intervenors sued current Sheriff Jones, current Deputy Chief Huggins, and former Sheriff Butler in their official capacities. These defendants contend that, except as Title VII backpay, they are entitled to eleventh amendment immunity from damages in their official capacities. *See Parker v. Williams,* 862 F.2d 1471, 1476 n. 4 (11th Cir.1989) ("suits against an official in his or her official capacity are suits against the entity the individual represents"). Both the Dodson intervenors and these defendants agree that, except as Title VII backpay, the defendants are entitled to immunity for damages in their official capacities if they are state officials. *Id.* at 1475.

The Dodson intervenors contend that, although these defendants are state officials for some purposes, they are county officials when acting on personnel matters. The Eleventh Circuit Court of Appeals has already addressed this issue and rejected the intervenors' characterization. In *Parker,* an Alabama sheriff was sued under § 1983 for gross negligence in hiring and thus was viewed as having acted on a personnel matter. The appellate court wrote: "In this case, [the Sheriff] is a state official being sued in his official capacity for retroactive damages likely to be paid out of the state treasury. The state has neither consented to suit nor waived its Eleventh Amendment immunity." *Parker,* 862 F.2d at 1476 (footnote omitted). Based on *Parker,* this court concludes that Jones, Huggins, and Butler are entitled to summary judgment on the Dodson intervenors' claim for damages against them in their official capacities, except as to Title VII backpay.

### III. THE DODSON INTERVENORS' MOTION TO RECONSIDER

The Dodson intervenors were allowed to file their complaint-in-intervention on November 27, 1990, and they sued, among others, defendants Butler and Huggins in their official capacities only. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala.). On June 7, 1991, the intervenors moved to amend their complaint to clarify the allegations, and on June 11, 1991, the court allowed the amendment. *Id.* A year later, on June 5, 1992, the intervenors moved to amend their complaint again, this time to add a number of claims, including claims against former Sheriff Butler and Deputy Chief Huggins in their individual capacities. The court denied the motion to amend on June 18, 1992, although it did not specifically address the individual capacity claims. *Id.* On October 19, 1992, the intervenors moved for reconsideration, and it is this motion that is now before the court. The defendants argue that the Dodson intervenors' initial motion to amend filed on June 5, 1992, was inexcusably dilatory. The defendants note that the intervenors have offered no explanation as to why they waited 18 months after the filing of their original complaint-in-intervention before seeking leave to amend the complaint. Moreover, according to the defendants, the intervenors have offered no excuse for waiting an additional four months to move for reconsideration after the court denied the motion to amend.

## A. *Leave to Amend*

Rule 15(a) of the Federal Rules of Civil Procedure allows a party to amend a pleading "once as a matter of course" anytime before a responsive pleading is served. After a responsive pleading is served, as was done here, an amendment may be allowed "only by leave of the court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The Eleventh Circuit has written: "Rule 15(a) evinces a bias in favor of granting leave to amend. Its purpose is to assist the disposition of the case on its merits, and to prevent pleadings from becoming ends in themselves." *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1163 (5th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). In deciding whether to allow an amendment, a trial court should consider "lack of diligence" and, if so, whether there was "excusable neglect." *Id.* The Eleventh Circuit stated: "Mere passage of time need not result in a denial of leave to amend but delay becomes fatal at some period of time. When there has been an apparent lack of diligence, the burden shifts to the movant to prove that the delay was due to excusable neglect." *Id.* (citation omitted). Other factors the trial court should consider include: "whether permitting the amendment will cause undue delay in the proceedings or undue prejudice to the nonmoving party"; "whether the movant is acting in bad faith or with a dilatory motive"; "whether the movant has previously failed to cure deficiencies in his pleadings by prior amendments"; "whether the amendments would lead to expeditious disposition of the merits of the litigation"; and "whether the amendment adds substance to the original allegations, and whether it is germane to the original cause of action." *Id.*

On the one hand, this court agrees with the defendants that the Dodson intervenors have not shown excusable neglect. The intervenors have not even attempted to explain why they waited 18 months to seek to amend their complaint-in-intervention or why they waited an additional four months to move for reconsideration. The intervenors'
only explanation is that the amendment was to rectify an oversight in the original complaint and that the amendment is necessary to ensure that the intervenors receive full relief. Neither of these statements, however, gives any reason whatsoever for the delay. In addition, the motion for reconsideration was not made until after the discovery deadline had lapsed and after the final pretrial conference.

On the other hand, the defendants do not argue that allowing the amendment would prejudice them, and the court can ascertain no prejudice to the defendants. The only new defenses the amendment would add are those of qualified immunity and statute of limitations, and the defendants have already fully briefed these issues. The defendants cannot point to any additional discovery or significant change in trial preparation resulting from the amendment. Moreover, it appears that the Dodson intervenors would be prejudiced by being unable to sue former Sheriff Butler and Deputy Chief Huggins in their individual capacities: absent the amendment, the intervenors are unable to pursue any damages other than backpay. The defendants also do not claim that the intervenors acted in bad faith or with a dilatory motive in failing to move to amend earlier. Therefore, although the intervenors' 18–month and four-month delays are inexplicable, the court is not convinced that the amount of time is so egregious that the delays alone merit denying the motion for reconsideration.

There is, nonetheless, still a reason to deny reconsideration. The court agrees with the defendants that the amendment would be futile. As the court explains below, both former Sheriff Butler and Deputy Chief Huggins are entitled to qualified immunity in their individual capacities. In addition, the claims against them in their individual capacities are time barred.

## B. *Qualified Immunity*

Former Sheriff Butler and Deputy Chief Huggins maintain that they are entitled to qualified immunity on any claims against them in their individual capacities.

To overcome this defense, the Dodson intervenors must show that Butler and Huggins violated what were, in the circumstances, the intervenors' "clearly established" federal right and that a reasonable government official in a similar position would have known that Butler and Huggins's actions were unlawful. *Harlow v. Fitzgerald,* 457 U.S. 800, 817–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Rodgers v. Horsley,* 39 F.3d 308 (11th Cir.1994) (per curiam). Here, this court actually approved the defendants' actions, thereby implicitly giving the impression that their actions were allowed by law. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Dec. 1, 1988). Under these circumstances, where a defendant has acted pursuant to a court order—and, in this case, pursuant not just to the general wording of a consent decree but to a specific court order authorizing their conduct—they are entitled to qualified immunity. *See Wilson v. Bailey,* 934 F.2d 301, 304 n. 1 (11th Cir.1991) (because "Personnel Board members acted pursuant to a consent decree approved by a district judge," they were entitled to qualified immunity).

■ Admittedly, the Dodson intervenors contend that, in making the 1988 promotions, former Sheriff Butler and Deputy Chief Huggins did not rely on the consent decree. However, even if Butler and Huggins did not specifically rely on the 1973 *Sims* decree or had not acted pursuant to a court order approving their conduct, they would still be entitled to qualified immunity. The Dodson intervenors have "failed to show the existence in [1988] ... of 'clearly established' law that would have made it readily apparent to reasonable persons that what defendants were doing was a violation of federal law." *Rodgers,* 39 F.3d at 312.

### C. *Statute of Limitations*

■ The Dodson intervenors' claims against former Sheriff Butler and Deputy Chief Huggins in their individual capacities are also time barred. The longest limitation period applicable to their claims is two years. *Lufkin v. McCallum,* 956 F.2d 1104 (11th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 246 (1992).[18] Because the promotions were made in 1988 and because the Dodson intervenors did not seek to add Butler and Huggins in their individual capacities until 1992, over four years later, the Dodson intervenors' effort comes too late.

### D. *Relation Back*

■ Relying on Rule 15(c)(3), the Dodson intervenors suggest that, even if their claims against former Sheriff Butler and Chief Deputy Huggins in their individual capacities were filed beyond the limitations period, the claims relate back to the filing of the original motion to intervene. The court rejects this contention.

■ Rule 15(c)(3) permits a plaintiff to amend the original pleading to add an additional defendant if the defendant has received notice of the lawsuit so that the defendant will not be prejudiced in maintaining a defense on the merits, and the defendant knew or should have known that, but for a "mistake" concerning the identity of the proper party, the defendant would have been sued. The critical question here is whether the Dodson intervenors were mistaken about the identity of Butler and Huggins as proper parties or whether they were simply negligent by not including Butler and Huggins in their original complaint-in-intervention. As the Ninth Circuit Court of Appeals has held, "Rule 15(c) was intended to protect a plaintiff

18. Admittedly, in 1988, the limitation period applicable to the 1988 promotions was six years. *Jones v. Preuit & Mauldin,* 763 F.2d 1250 (11th Cir.1985), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986). Admittedly also, the Eleventh Circuit held in 1991 that the decision of the Supreme Court in *Owens v. Okure,* 488 U.S. 235, 246 & n. 9, 109 S.Ct. 573, 580 & n. 9, 102 L.Ed.2d 594 (1989)—that the Alabama limitation period applicable to § 1983 lawsuits is two years—should not be applied retroactively: *Kimbrough v. Bowman Transp., Inc.,* 920 F.2d 1578 (11th Cir.), *vacated on other grounds,* 929 F.2d 599 (11th Cir.1991); *Kendrick v. Jefferson County Bd. of Educ.,* 932 F.2d 910 (11th Cir.1991); and *McKissick v. Busby,* 936 F.2d 520 (11th Cir. 1991). However, in *Lufkin,* the Eleventh Circuit held that, in light of *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), *Owens* must be given full retroactive effect and that, as a result, *Kimbrough, Kendrick,* and *McKissick* were no longer good law within the circuit. *Lufkin,* 956 F.2d at 1106–1108.

who *mistakenly* names a party and then discovers, after the relevant statute of limitations has run, the identity of the proper party." *Kilkenny v. Arco Marine, Inc.,* 800 F.2d 853, 857 (9th Cir.) (emphasis added), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987). "Rule 15(c) was never intended," the court continued, "to assist a plaintiff who ignores or fails to respond in a reasonable fashion to notice of a potential party, nor was it intended to permit a plaintiff to engage in piecemeal litigation." *Id.* at 857–58.

The Dodson intervenors did not misdescribe the proper defendants nor were they mistaken about the identity of the proper defendants. Instead, at all times before and after their claim against Butler and Huggins accrued, they knew the identity of these defendants but simply failed to name them in their individual capacities in their original complaint-in-intervention. The Dodson intervenors' amendment to their complaint-in-intervention, even if allowed, would not relate back within the meaning of Rule 15(c)(3).[19]

## IV. CONCLUSION

The court must state that, in their challenge to the 1988 promotions to sergeant, the Dodson intervenors have not been clear and consistent. At times, it appeared that the essence of their challenge was to the legality of the 1973 *Sims* decree and the defendants' action pursuant to the decree, and, at other times, it appeared that the intervenors were simply challenging the defendants' interpretation of the decree. In addition, because the Dodson intervenors appeared at times to agree that the defendants could have legally promoted two blacks in 1988, it could be concluded that the issues before the court boiled down to the propriety of only one promotion. In any event, because the issues presented are sensitive and of great public importance and in order to be sure that all issues are fully addressed, the court has read the Dodson intervenors' challenge liberally and broadly.

An appropriate judgment will therefore be entered.

### *JUDGMENT*

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the defendants' motions for summary judgment, etc., filed on October 16, 1992, and February 2, 1993, are granted;

(2) That the Dodson intervenors' motions for summary judgment, filed on January 6 and 11, 1993, and motion for reconsideration, etc., filed on October 19, 1992, are denied; and

(3) That judgment is entered in favor of the defendants and against the Dodson intervenors on said intervenors' complaint-in-intervention, with said intervenors to take nothing by their complaint-in-intervention.

It is further ORDERED that costs are taxed against the Dodson intervenors, for which execution may issue.

---

**19.** Former Sheriff Butler and Deputy Chief Huggins contend that they were not served within the 120 days allowed by Rule 4(m), previously Rule 4(j) of the Federal Rules of Civil Procedure and therefore should be dismissed as defendants. The court does not reach this issue.

Defendant Montgomery County Commission asserts that it is not liable under any of the Dodson intervenors' claims because it neither participated in nor was on notice of any alleged constitutional or statutory violation. The Commission argues that, although it hired the Center for Business and Economic Development as an independent professional consultant pursuant to the 1986 supplemental consent decree in *Williams,* there is no evidence that the Commission had any input into the Center's development of selection procedures or the employment decisions made by the Sheriff's Department. Because the court concludes that all defendants are entitled to summary judgment, this separate factual contention by the Montgomery County Commission need not be reached.