Clara SIMS, et al., Plaintiffs,

W.T. Scott, et al., Plaintiff–Intervenors,

v.

MONTGOMERY COUNTY COMMISSION, et al., Defendants,

Albert B. Dodson, et al., Defendant–Intervenors.

Sallie WILLIAMS and Johnie Love, Plaintiffs,

v.

MONTGOMERY COUNTY SHERIFF'S DEPARTMENT, et al., Defendants,

Albert B. Dodson, et al., Defendant–Intervenors.

Civ. A. Nos. 3708–N, 82–T–717–N.

United States District Court,
M.D. Alabama,
Northern Division.

July 3, 1995.

Wayne Sabel, Montgomery, AL, for Williams Love class.

Rick Williams and David G. Flack, Montgomery, AL, for Dodson defendant-intervenors.

Thomas T. Gallion, III, Haskell, Slaughter & Young, Montgomery, AL, Kenneth L. Thomas, and Tyrone C. Means, Thomas, Means & Gillis, P.C., Montgomery, AL, for defendant Montgomery County Commission.

Delores Boyd (court appointed) Montgomery, AL, for named plaintiffs, named plaintiff-intervenors and Sims/Scott classes.

Sylvester Hardy, Montgomery, AL, pro se.

Alvah Reid, Sr., Montgomery, AL, pro se.

Sally Williams, Montgomery, AL, pro se.

### MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

This litigation consists of two class-action lawsuits: *Sims v. Montgomery County Comm'n*, civil action no. 3708–N (M.D.Ala.), and *Williams v. Montgomery County Sheriff's Dept.*, civil action no. 82–T–717–N (M.D.Ala.).[1] In 1972 in *Sims*, a class of African–American employees sought relief from the Montgomery County Sheriff's Department's racially discriminatory employment practices, and, ten years later in 1982 in *Williams*, a class of female employees and applicants for employment charged the department with sex discrimination. The defendants include the following: the Montgomery County Sheriff's Department, its sheriff, its chief deputy, its jail administrator, and its assistant jail administrator; the Montgomery County Commission and its commissioners; and the Montgomery City–County Personnel Board. In a memorandum opinion entered in these two cases on November 27, 1990, the court found that the department had continued to discriminate on the bases of race and sex against its officers, in violation of the equal protection clause of the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983, and in violation of Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17. *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052 (M.D.Ala. 1990). In an accompanying judgment and injunction, the court required, among other things, that the department develop and implement new, nondiscriminatory permanent promotion procedures. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Nov. 27, 1990).

---

1. *Williams v. Montgomery County Sheriff's Dept.*, civil action no. 82–T–717–N (M.D.Ala.), was originally brought by Lois Johnson and was, until recently, styled *Johnson v. Montgomery County Sheriff's Dept.* The style changed when Sallie Williams and Johnie Love replaced Johnson as plaintiffs.

On October 20, 1994, in settlement of this litigation, all parties except the "Dodson intervenors" (who represent white officers in the department) joined in a motion for approval of a permanent promotion plan[2] for the ranks of sergeant, lieutenant, and captain in both the law enforcement and corrections divisions of the department.[3] The defendants requested that the court move with dispatch because the proposed plan had a beginning date of January 1, 1995. On December 7, 1994, after giving public notice of the proposed plan and holding two fairness hearings pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and 42 U.S.C.A. § 2000e–2(n)(1), the court entered an order summarily approving the proposed plan, without giving any reasons for approval. The court promised that a formal memorandum opinion and judgment would follow later. This is the promised memorandum opinion, and the promised judgment accompanies this opinion.

## I. BACKGROUND

Recently, in two memorandum opinions rejecting challenges by the Dodson intervenors to departmental promotions in 1988, *Sims v. Montgomery County Comm'n*, 873 F.Supp. 585 (M.D.Ala.1994), and to departmental promotions in 1993, *Sims v. Montgomery County Comm'n*, 887 F.Supp. 1479 (M.D.Ala.1995), the court set forth in some detail the background history of this litigation. However, because the Dodson intervenors have lodged substantial objections to the proposed permanent promotion plan and because, if approved, the plan will result in the termination of a major phase of this litigation, the court will revisit this history, albeit only in part.

### A. Sims Litigation

In the *Sims* litigation in 1973, the court approved and entered a consent decree re-

quiring that the Montgomery County Commission conduct "all hiring and personnel practices, programs and procedures on a non-discriminatory basis without regard to race, color, creed or national origin." Civil action no. 3708–N (M.D.Ala. March 22, 1973) (plan attached at 1, ¶ 1). The 1973 *Sims* decree further provides that, unless approved or "validated" under standards and procedures set out in the decree, a selection procedure can be used only if it does "not have a disproportionate detrimental impact upon minority applicants." *Id.* (plan attached at 6, ¶ 6).[4]

Fifteen years later, in 1988, four African–American officers, collectively called the "Scott intervenors," moved to intervene in the *Sims* litigation, charging that the Montgomery County Sheriff's Department was continuing to discriminate against black employees in violation of the 1973 *Sims* decree. The court certified a plaintiff-intervenor class of all "black persons who are past, current, and future employees of the Montgomery County Sheriff's Department." Civil action no. 3708–N (M.D.Ala. Nov. 2, 1988). As a result of this round of litigation, the court on November 27, 1990, found that the department was continuing to discriminate against its black officers, and entered a permanent injunction prohibiting the department from further racial discrimination and requiring the department to change its personnel procedures. *Sims*, 766 F.Supp. at 1102–03. In an accompanying judgment and injunction, the court required that the department fashion, within six months, new, nondiscriminatory procedures for promotion of non-blacks and blacks. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Nov. 27, 1990).

### B. Williams Litigation

In the *Williams* litigation in 1983, the court certified a plaintiff class of "all past, present, and future female employees of the

---

2. A copy of the proposed permanent promotion plan is attached as an appendix to the judgment that accompanies this memorandum opinion.

3. The department is divided into two divisions: corrections and law enforcement. The law enforcement division is responsible for the operation of the Montgomery County Detention Cen-

ter, also known as the county jail. *Sims*, 766 F.Supp. at 1062.

4. The court has applied this *Sims* decree provision not only to tests but to seniority-based promotions. *See Sims*, 873 F.Supp. at 599–603; 3708–N & 82–T–717–N (M.D.Ala. Feb. 1, 1995).

Montgomery County Sheriff's Department." *Johnson v. Montgomery County Sheriff's Dept.*, 99 F.R.D. 562, 566 (M.D.Ala.1983). Two years later, in 1985, as a result of this litigation, the court approved and entered a consent decree prohibiting the department from discriminating against its female officers and requiring that it adopt new, nondiscriminatory policies with regard to promotions, transfers, and job and shift assignments. *Johnson v. Montgomery County Sheriff's Dept.*, 604 F.Supp. 1346 (M.D.Ala. 1985). The department agreed to develop promotion procedures that conform with the "1978 Uniform Guidelines [on Employee Selection Procedures,] 29 CFR § 1607 et seq.," *id.* at 1354, and that "will have little or no adverse impact on women seeking to be . . . promoted to ranking positions." *Id.* at 1350. The 1985 decree provides that "Adverse impact will be measured by the 'four fifths rule' set forth in § 4(D) of the Uniform Guidelines." [5] *Id.* at 1355.

In 1986, the *Williams* class filed a request for additional relief. In a 1986 supplemental consent decree resolving the request, the department agreed to hire an independent professional consultant, mutually selected by the parties, to develop temporary and eventually permanent promotion procedures for all ranks as required by the 1985 decree. Civil action no. 82–T–717–N, at 5 (M.D.Ala. July 24, 1986). In 1988, the *Williams* class charged that the department was continuing to discriminate against women. As a result of this round of litigation, the court on November 27, 1990, found that the department had discriminated and retaliated against female employees, and entered a permanent injunction prohibiting the department and its officers from engaging in further sexual discrimination and retaliation, and requiring the department to take affirmative and immediate steps to address sexual harassment and discrimination within the department. *Sims*, 766 F.Supp. at 1079–80. In an accompanying judgment and injunction, the court also required that the department fashion, within six months, new, nondiscriminatory procedures for promotion of men and women. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Nov. 27, 1990).

#### C. Dodson Intervenors

In 1990, the court permitted a group of white male officers, collectively called the "Dodson intervenors," to intervene as defendants in this litigation. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Nov. 27, 1990). Two years later, in 1992, the court certified the Dodson intervenors as a class for the purpose of challenging promotion procedures within the department. *Id.* (May 18, 1992). The court found, however, that the intervenors did not have standing to challenge hiring, recruitment, or job assignments in the department. *Id.*

#### D. Interim Promotion Plan

In 1992, in an effort to comply with the court's judgment and injunction entered in both the *Sims* and *Williams* cases on November 27, 1990, the department submitted an interim plan, and this plan was approved by the court. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Jan. 13, 1992). The interim plan did not establish policies and procedures for promotions but instead provided for procedures by which African–Americans and women in the department could file objections to the specific promotion procedures later developed under the plan if these procedures would "result in adverse impact against a protected class or otherwise violate the rights of a protected class under an outstanding Court order." [6]

#### E. Proposed Permanent Promotion Plan

On January 5, 1994, in an effort to comply with the memorandum opinion and judgment

---

5. In a memorandum opinion entered on December 29, 1994, the court held that, although the 1973 *Sims* decree used the term "disproportionate detrimental impact," both the 1973 *Sims* decree and the 1985 *Williams* decree should be interpreted to incorporate the 1978 Uniform Guidelines' four-fifths rule. *Sims*, 873 F.Supp. at 600.

6. Joint petition for approval of interim plan, filed January 7, 1992, at ¶ 1. In the memorandum opinion of December 29, 1994, the court incorrectly suggested that the interim plan contained new policies and procedures for promotion. *Sims*, 873 F.Supp. at 594.

entered on November 27, 1990, the defendants submitted a proposed permanent promotion plan for the ranks of sergeant, lieutenant, and captain in both the law enforcement and corrections divisions of the department. They amended their proposed plan on January 21, 1994. On February 4 and 7, 1994, the Sims plaintiffs, the Scott intervenors, the Williams plaintiffs, and the Dodson intervenors all responded with objections.

On October 20, 1994, in settlement of this litigation, all parties except the Dodson intervenors joined in a motion for approval of a new proposed permanent promotion plan for the three ranks, and it is this plan that is now before the court. It is important to note that the proposed plan does not contain actual selection procedures for a rank but rather establishes the broad policies and requirements that will govern the later development of actual selection procedures.

The central feature of the proposed plan is that all promotion procedures developed under it must use "banding." Montgomery County Sheriff's Department's Promotions Plan and Policies (hereinafter referred to as "Plan") §§ 2.0(d), 5.05. Under this concept, qualified candidates are tested and then grouped into two or more bands based on a range of scores. Candidates within a band are considered to be equally qualified. *Id.* § 2.0(d). Each band is exhausted in turn beginning with the band with the highest scores. *Id.* § 5.05. "Banding has the advantage of explicitly considering the Uniform Guidelines warning to avoid overinterpreting small score differences."[7]

*Establishing the Bands.* In determining how candidates should be grouped within bands and in anticipation of a challenge under Title VII to the "validity," or job-relatedness, of the procedures, the proposed plan

requires that promotion procedures follow a "content validity" strategy, one of three test validation strategies recognized by the Uniform Guidelines, and by the more recent Principles for the Validation and Use of Personnel Selection Procedures (1987) and Standards for Educational and Psychological Testing (1985).[8] "The goal of the content-validity approach is to develop selection procedures 'representative of important aspects of performance on the job.'" *United States v. City of Montgomery*, 775 F.Supp. 1450, 1453 (M.D.Ala.1991) (quoting Uniform Guidelines, 29 C.F.R. § 1607.5(B)). "In other words, 'the test itself [must] closely approximate the tasks to be performed on the job. The classic example of a test having content validity is a typing test for a typist job position.'" *Id.* (quoting B. Schlei & P. Grossman, *Employment Discrimination Law* 114 (2nd ed. 1983)).[9]

Under this approach, the development of any promotion procedure must include first a "job analysis" and a determination of, among other things, what "knowledge, skills, and abilities"—commonly referred to as "KSAs"—are important for job performance.[10] The KSAs identified at this point are called "tapped KSAs." The proposed permanent promotion plan authorizes a variety of testing devices for scoring candidates and placing them within bands based on these tapped KSAs and other information; these devices include "multiple choice written test; structured oral interview; role play/job simulation; writing sample." Plan § 2.0(k). Under the plan, candidates within a band "are considered to be equally qualified with respect to the [tapped KSAs] measured by a selection procedure." Plan § 2.0(d).

---

**7.** Appendix to joint motion for approval of proposed permanent promotion plan, filed October 20, 1994, vol. 1 at 25.

**8.** *Id.* at 17.

**9.** "The other methods of validation are 'criterion-related' validation, which is established when 'there is a significant positive correlation between comparative success on the test and comparative success on some measure of job performance,' ...; and 'construct' validation, which is established when 'there is a significant relation-

ship between the test and the identification of some trait, such as "intelligence" or "leadership," which is required in the performance of the job.'" *City of Montgomery*, 775 F.Supp. at 1453 n. 3 (quoting B. Schlei & P. Grossman, *Employment Discrimination Law* 114 (2nd ed. 1983)).

**10.** Appendix to joint motion for approval of proposed permanent promotion plan, filed October 20, 1994, vol. 1 at 24.

The width of the bands must be determined based on the "standard error of difference". Plan § 5.05. The standard error of difference "is a measure of the accuracy of the promotions procedure which takes into account the range of scores on the procedures and the reliability of those procedures. The more reliable the procedures, the smaller the [standard error of difference], and consequently, the smaller the band." *Id.* The department may "select[ ] any of the equally-qualified candidates for promotion," *id.,* but must "exhaust[ ] the top-most band before considering candidates from lower bands." *Id.*

If there are fewer than six candidates for promotion, however, the department need not go through the formal procedure for the establishment of bands. The department may consider all candidates as equally qualified and eligible for consideration for promotion. Plan § 6.01.

*Selecting from among "Equally Qualified" Candidates.* Any promotion procedures developed under the proposed plan must also provide for a "rank-ordered listing" of the "equally qualified" candidates within a band, with the ranking done by "promotions panels" established by the department. Plan § 6.03. In making a selection from within a band, the department must consider but is not bound by this rank-ordering. *Id.* § 6.03(c).

Separate promotions panels must be established for the corrections and enforcement divisions, and each panel must have not less than three and not more than five members. Plan § 6.03(a). The panels may consist of only captains. However, if the number of captains in either division is insufficient to constitute a panel of the size designated, the department may appoint additional members having a rank at least equivalent to the rank under consideration. *Id.* If a panel does not include an African–American or a female, the department may substitute or add members, not to exceed a five-member panel, in order "to further the Department's continuing commitment to ensure fair representation of all races and genders on departmental panels." *Id.* In addition, "for this purpose, the [department] may select panel members outside the Division under consideration and/or outside the Department." *Id.*

The promotions panels are to "assess each of the candidates certified for promotion, applying job-related criteria established by the expert consultant" from "two areas: (1) untapped [KSAs], and (2) work habits." Plan § 6.03(b). Untapped KSAs are "defined as those KSAs identified by the job analysis as important but untapped ... by the selection procedures used to establish" the bands. *Id.* Work habits "include an assessment of attendance, punctuality, compliance with departmental rules, and relationships with co-workers." *Id.*

For a period of two years from the effective date of the proposed permanent promotion plan, the department must consider "adverse impact" data, if the data permit statistically meaningful conclusions, in making selections from the promotions panel's rank-ordered listings. Plan § 6.03(d). Adverse impact is defined as "a legal standard which refers to a substantially different selection rate for different subgroups (e.g., race or gender) as defined by a test of statistical significance or the Uniform Guidelines' four-fifths rule." *Id.* § 2.0(a).

These rank-ordering procedures apply to candidates under consideration by the department even if there are fewer than six candidates for promotion. Plan § 5.01.

*Other Salient Features.* The proposed permanent promotion plan requires that the 1992 interim plan for promotions in the Montgomery County Sheriff's Department be dissolved.[11] It further requires that all provisions in prior orders that require or authorize the Montgomery County Sheriff's Department to avoid "adverse impact" on the basis of race or sex in promotions be dissolved except as provided in the proposed permanent promotion plan.[12]

The plan provides for the disqualification of candidates because, for example, the can-

---

**11.** Joint motion for approval of proposed permanent promotion plan, filed October 20, 1994, at 8.

**12.** *Id.* at 9.

didate's application was not received on time or the candidate failed to meet minimum qualifications. Plan § 5.04. However, under the plan, the Personnel Department must furnish all disqualified candidates with written notice within five days of the fact of disqualification and the reason for that action. *Id.* The plan also provides that all candidates who compete will be given written notice of the results of each part of the selection procedure, including their scores on each part and standing on the promotional register, and will be notified of opportunities to review their performance with the test developers and gain feedback designed to help them fare better on future tests. *Id.* § 5.06.

## II. DISCUSSION

The court will first address whether the plan should be approved as to the various plaintiff classes—the Sims plaintiffs, the Scott intervenors, and the Williams plaintiffs—pursuant to Rule 23 of the Federal Rules of Civil Procedure. The court will next consider whether the plan should be approved as to any other interested and possibly affected persons—in particular, the Dodson intervenors—pursuant to 42 U.S.C.A. § 2000e–2(n)(1).

### A. *The Sims Plaintiffs, the Scott Intervenors, and the Williams Plaintiffs*

■ Because the proposed permanent promotion plan is a settlement of claims in a class action, the first issue for the court is whether the settlement is fair, adequate, and reasonable. It is well established that voluntary settlement is the preferred means of resolving class-action employment discrimination cases. *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1147 (11th Cir.1983). It is also established, however, that, because the settlement process is subject to abuse, courts must independently evaluate whether the settlement is fair, adequate, and reasonable. *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1169 (5th Cir.1978), *cert. denied,*

439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). For instance, the interests of the class and its lawyer may diverge, or some members of the class may be "sold out" by other members. *Pettway,* 576 F.2d at 1169. As part of determining fairness, adequacy, and reasonableness, the court must also ensure that the settlement is not collusive. *Piambino,* 757 F.2d at 1139. Finally, the court has the duty of ensuring that the settlement is not illegal or against public policy. *United States v. City of Alexandria,* 614 F.2d 1358, 1362 (5th Cir.1980).

■ "In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself. Because the views of the class are so critical, the court must first ensure that the requirement of Rule 23(e) ...—that notice of the proposed decree be sent to all class members—has been satisfied." *Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511, 1517 (M.D.Ala. 1994). In this case, court-approved notices were distributed individually to the Montgomery County Sheriff's Department's present employees. Notices were also posted in conspicuous places within the department. The notices advised recipients that their employment and promotion opportunities might be affected; they included specific information about how to present objections in writing and at the fairness hearings; and they had attached to them copies of the proposed permanent promotion plan. A fairness hearing was held on November 14, 1994, and a supplemental fairness hearing was held on November 28, 1994, both times to seek the views of all employees in the department. The court concludes as a threshold matter that the notice and fairness hearings were adequate to inform all departmental employees about the provisions of the proposed permanent promotion plan and to solicit and determine their views.

The court cannot escape the conclusion that the classes represented by the Sims plaintiffs, the Scott intervenors, and the Williams plaintiffs are all overwhelmingly in support of the proposed plan. Although given an opportunity to make objections, none was received from these class members.

■ In addressing whether a settlement is fair, adequate, and reasonable a court should also consider the judgment of experienced counsel for the class. *Pettway,* 576 F.2d at 1215. Counsel for the Sims plaintiffs, the Scott intervenors, and the Williams plaintiffs have argued forcefully to the court that the proposed plan is fair, adequate, and reasonable. These counsel have been intimately involved with the issues in this litigation for many years and spent many months negotiating the proposed plan with the defendants; their views are taken seriously by this court.[13]

■ There is no evidence that the proposed permanent promotion plan was a product of collusion between opposing counsel, or that the parties engaged in illegal negotiations to reach the proposed settlement. To the contrary, the evidence reflects that the parties engaged in arms-length negotiations.

The court also has no reason to suspect that the proposed plan treats unfairly any portion of the various classes represented by the Sims plaintiffs, the Scott intervenors, and the Williams plaintiffs, especially in light of the absence of any objections from these class members. There appears to be no overt conflict within the class. The plan does not preclude or in any way limit individual suits by anyone for damages against the defendants. The overall impact of the proposed plan will be systemic relief. There is no delineation among class members as to the applicability of any provision contained in the proposed decree. As this court has written before, "where the settlement provides for structural changes with each class member's interest in the adequacy of the change being substantially the same, and where

there are no conflicts of interests among class members or among definable groups within the class, then the decision to approve the settlement 'may appropriately be described as an intrinsically 'class' decision in which majority sentiments should be given *great weight.'"* *Paradise v. Wells,* 686 F.Supp. 1442, 1445 (M.D.Ala.1988) (quoting *Pettway,* 576 F.2d at 1217) (emphasis in original)).

With the above considerations in mind, the court must also independently assess whether the proposed plan is fair, adequate, and reasonable. The court believes that the permanent promotion plan should be a significant benefit to all plaintiff class members. The plan establishes standardized promotion procedures to ensure that all applicants are considered on the basis of their qualifications. The plan's job related selection procedures serve compelling business goals of the defendants and afford all employees, regardless of race or sex, equal opportunity to compete for promotions on nondiscriminatory terms. In light of the above considerations, the court concludes that the proposed permanent promotion plan is fair, adequate, and reasonable.

Finally, as stated, the court also has the duty of ensuring that the proposed plan is not illegal or against public policy. The court addresses this issue in the next subsection of this memorandum opinion.

### B. The Dodson Intervenors

The court turns next to whether the proposed permanent promotion plan should be approved as to any non-plaintiff-class members (in particular, the Dodson intervenors) pursuant to 42 U.S.C.A. § 2000e–2(n)(1).[14]

---

13. Although the court must be sensitive to potential conflict between the class and its attorneys, *Pettway,* 576 F.2d at 1215, no one has suggested the presence of such conflict or questioned in any manner counsel's dedication to the parties and classes they represent.

14. 42 U.S.C.A. § 2000e–2(n)(1), as added by the Civil Rights Act of 1991, Public Law 102–166, 105 Stat. 1071 (1991), provides in pertinent part:
  "(A) Notwithstanding any other provision, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment

or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).
  "(B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws—
  "(i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had—
  "(I) actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect

As stated, notices were also sent to employees not represented by the Sims plaintiffs, the Scott intervenors, and the Williams plaintiffs. The Civil Rights Act of 1991 precludes later challenges to a settlement resolving employment discrimination claims from those persons who, though not members of the class whose attorneys signed off on the settlement, still had actual notice of the proposed decree and a reasonable opportunity to present objections. 42 U.S.C.A. § 2000e–2(n)(1)(B). The notices and fairness hearings were sufficient under the 1991 Act. All employees in the positions covered by the decree were made aware that the proposed plan might adversely affect their interests and were invited to respond in writing and at the two fairness hearings.[15] The Dodson intervenors filed a number of objections challenging, among other things, the legality of the proposed permanent promotion plan.[16]

i.

■ The Dodson intervenors' strongest objection is that the proposed permanent promotion plan will have an "adverse or disparate impact" on white males in the Montgomery County Sheriff's Department. More specifically, they argue that application of the plan to already established and unexpired promotion registers, Plan § 1.0, "would have an adverse impact on white Americans ... [and] white male deputies," in violation of Title VII.[17] As the court explained in its

the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and
"(II) a reasonable opportunity to present objections to such judgment or order; or
"(ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact."

15. In addition, as a corollary to the requirements of § 2000e–2(n)(1)(B), the court is providing counsel for the objectors with notice of this memorandum opinion and judgment as well.

16. White females joined in the Dodson intervenors' objections. Civil action nos. 3708–N & 82–T–717–N, at 7–8 (M.D.Ala. May 19, 1995). However, because they added nothing substantively to the objections, the court has not treated them separately.

memorandum opinion of November 27, 1990, "A 'disparate impact' claim differs from a 'disparate treatment' claim in that, with the latter, an employee must prove intentional discrimination, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), but with the former, the employee challenges 'practices that are fair in form but discriminatory in operation,' *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 645, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)); the employee need not prove intentional discrimination. *Wards Cove*, 490 U.S. at 645–46, 109 S.Ct. at 2119." *Sims*, 766 F.Supp. at 1100. Under Title VII, "An unlawful employment practice based on disparate impact is established" if a complaining party demonstrates that an employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin" and the employer "fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C.A. § 2000e–2(k)(1)(A).[18]

■ This objection by the Dodson intervenors is premature. Adverse impact is a measure of difference in selection rates for different groups. Uniform Guidelines, 29 C.F.R. § 1607.4(D); *see also* Plan § 2.0(a).[19]

17. Dodson intervenors' objections, filed on November 7, 1994, at 8.

18. Section 2000e–2(k)(1)(A), as amended in 1991, "expressly reinstated the law of 'business justification' as it existed before *Wards Cove* was decided" and "returned the burden of persuasion regarding business justification to the defendant employer." *Bradley v. Pizzaco of Nebraska, Inc.*, 7 F.3d 795, 797 (8th Cir.1993).

19. 29 C.F.R. § 1607.4(D) provides in part as follows:

"A selection rate for any race, sex, on ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact."

Whether any adverse impact will result cannot be determined until specific selection criteria have been established and applied and selections made.

### ii.

■ The Dodson intervenors contend that, using an underlying format similar to that contained in the proposed permanent promotion plan, the defendants have in the past intentionally discriminated against them and have developed specific promotion procedures and manipulated the resulting scores in a manner so as to benefit African–Americans who are less qualified than whites, in violation of Title VII and the equal protection clause.[20] The intervenors allege, for example, that the use of banding only if the number of candidates is six or more is "arbitrary and capricious and is for the purpose of race and sex discrimination";[21] they further allege that the methods the defendants have used in the past to establish bands, to assign weights to various selection devices, to eliminate test questions, and to determine scores from the oral interviews, were all adopted to assure that African–Americans were selected.[22] These challenges must fail, first, because the intervenors have not submitted any evidence to support them, and, second, because the Sims plaintiffs, the Scott intervenors, the Williams plaintiffs, and the defendants have presented affirmative and sufficient credible evidence outlining the legitimate and nondiscriminatory considerations guiding the choice of selection procedures and the methods used to score the examinations. *See, e.g., Sims,* 887 F.Supp. at 1483–1485 (court rejected challenge by Dodson intervenors that, for the 1993 selections for promotion to sergeant and lieutenant in the Montgomery County Sheriff's Department's law enforcement division, the department selected, weighed, and scored test materials in a manner that would advantage African–Americans).

Admittedly, in the past, when two or more selection procedures measured a given KSA with substantial equal validity, the department chose the procedure that would likely have less adverse impact on a racially or sexually defined group. This course of action is, however, required by law. 29 C.F.R. § 1607.3(B) provides, in part, that "Where two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact."

### iii.

■ The intervenors object to the requirement that, for two years, the department must consider "adverse impact" data, if the data permit statistically meaningful conclusions, in making selections based on a promotions panel's rank-ordered listing. Plan §§ 6.03(d), 5.01. The intervenors argue that this provision is "race conscious" and thus must pass "strict scrutiny" before it may be approved by the court. First, the defendants correctly observe that this provision places on them nothing that would not already be on them even in its absence. Title VII and the Uniform Guidelines essentially provide that a selection procedure which cannot be validated cannot have adverse racial impact. 42 U.S.C.A. § 2000–e–2(k)(1)(A); 29 C.F.R. § 1607.3(A). Because, as the evidence reflects, the procedure to be developed for selection based on a promotions panel's rank-ordered listing will probably not be capable of validation, the procedure must be applied in a manner that will avoid any "statistically meaningful" adverse racial impact.

■ In any event, the adverse-impact provision can withstand strict scrutiny. In its memorandum opinion of May 19, 1995, the court wrote that "It is now axiomatic that, absent necessary justification, the fourteenth amendment prohibits governmentally imposed racially discriminatory classifications. . . . Under the equal protection clause, this court must apply strict scrutiny to race-conscious relief voluntarily implemented by a

---

**20.** Dodson intervenors' objections, filed on November 7, 1994, at 10–15.

**21.** *Id.* at 16.

**22.** *Id.* at 10–14.

public employer, irrespective of whether the relief is embodied in merely a personnel decision or in a consent decree.... The 'purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the [defendant] is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.' [*Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989)]. Thus, there are two prongs to the strict scrutiny analysis: first, 'any racial classification "must be justified by a compelling governmental interest," ' and, second, 'the means chosen by the State to effectuate its purpose must be "narrowly tailored to the achievement of that goal." ' *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 285, 106 S.Ct. 1842, 1852, 90 L.Ed.2d 260 (1986) (plurality opinion) (citations omitted)" *Sims,* 887 F.Supp. at 1485, (citations omitted). *See also Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); *Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1564 (11th Cir.1994); *Peightal v. Metro. Dade County,* 26 F.3d 1545, 1552 (11th Cir. 1994); *In Re Birmingham Reverse Discrimination Emp. Lit.,* 20 F.3d 1525, 1534 (11th Cir.1994); *Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511, 1520 (M.D.Ala. 1994). This court further wrote that "The Supreme Court has indicated that the government 'unquestionably has a compelling interest in remedying past and present discrimination.' *United States v. Paradise,* 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality opinion).... Whether race-conscious relief serves a remedial purpose with respect to past discrimination is an evidentiary issue. The court need not make 'formal findings' of discrimination; rather, there must be a 'strong basis in evidence' for the conclusion that the consent decree or voluntary action remedies past discrimination. *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849)." *Sims,* 887 F.Supp. at 1487 (citations omitted).

The court again adopts the background history of race discrimination in the Sheriff's Department documented in the memorandum opinions of December 29, 1994, *Sims v. Montgomery County Commission,* 873 F.Supp. 585 (M.D.Ala.1994), and November 27, 1990, *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052 (M.D.Ala.1990). There, the court found that the Sheriff's Department "had intentionally discriminated against blacks in ... promotion, and especially in the enforcement division." 873 F.Supp. at 605. Admittedly, the period of time addressed in these two opinions was up until 1988. However, the black officers in the department have continued to suffer the vestiges of this past discrimination. In the judgment that accompanied the memorandum opinion entered on November 27, 1990, the court required, as part of the relief to redress the longstanding past discrimination, that the defendants fashion within six months new, nondiscriminatory permanent promotion procedures for the department. However, not until 1994 did the defendants do this.

The race-conscious relief before the court, therefore, is "lawful if it represents a 'narrowly-tailored' effort to remedy past ... discrimination" against African–Americans in the Sheriff's Department. *Stuart v. Roache,* 951 F.2d 446, 449 (1st Cir.1991), *cert. denied,* 504 U.S. 913, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992). The Supreme Court has set forth several factors to determine whether race-conscious relief is narrowly tailored: the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market (the "over- or under-inclusiveness" of the relief); and the impact of relief on the rights of third parties. *Paradise,* 480 U.S. at 179, 107 S.Ct. at 1070; *Shuford,* 846 F.Supp. at 1528.

The adverse-impact provision in the proposed permanent promotion plan meets this demanding requirement:

- As stated, it appears that the provision places on the department no more than

is already required by Title VII and the Uniform Guidelines.[23]

- The provision is extremely short-lived: only two years.
- The provision is neither under-inclusive nor over-inclusive, and does not establish any quotas for the department. It applies only to equally qualified candidates, and only if the data permit statistically meaningful conclusions. In addition, adverse impact is determined not by the racial make-up of the department as a whole, or even by that of any rank; rather it is measured, if statistically possible, based on the numbers within a band.
- The impact on third parties is, at most, marginal. The provision, as stated, applies only to equally qualified candidates and therefore does not require the promotion of any less qualified person over a more qualified person. It may be invoked by the Dodson-intervenor-class-members as well as by any of the plaintiff-class-members, and therefore does not foreclose the promotion of any person from a racially or sexually defined group. And, lastly, as stated, it is of very short duration.[24]
- The Dodson intervenors have not submitted an alternative procedure that would be any more race-neutral. Admittedly, they have submitted an alternative procedure for selections based on the promotions panels' rank-ordering; they would use criteria different from those contained in the proposed permanent promotion plan.[25] But because their alternative procedure is not any more amenable to validation, it would also be subject to the requirement of Title VII and the Uniform Guidelines, 42 U.S.C.A. § 2000–e–2(k)(1)(A); 29 C.F.R. § 1607.3(A), that it be applied only in a manner that avoids statistically mean-

ingful adverse racial impact. As the Supreme Court observed in *Local 28 of Sheet Metal Workers' International Association v. E.E.O.C.*, 478 U.S. 421, 450, 106 S.Ct. 3019, 3036 [92 L.Ed.2d 344] (1986), in some circumstances, "affirmative race-conscious relief may be the only means available."

- Finally, should the Dodson intervenors or the department eventually come up with a procedure that can be validated, it can still be used in the near future. Because the adverse-impact requirement in the plan is of such short duration, its end is almost around the bend.

iv.

■ The intervenors also object to use of the "four-fifths rule" in determining adverse impact.[26] Plan § 2.0(a). The Equal Employment Opportunity Commission has determined that adverse impact may be measured by the four-fifths rule, 29 C.F.R. § 1607.4(D). This court defers to that determination. *See Chevron, U.S.A., Inc. v. Natural Resources Defense*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–82, 81 L.Ed.2d 694 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations'") (quoting *United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). The four-fifths rule is therefore a legally acceptable method for determining whether there is adverse impact.

---

**23.** Indeed, this provision overrides other provisions in prior orders that arguably required or authorized the department to make all promotions in a manner that avoided adverse impact even though the applicable promotion procedures were content validated.

**24.** The Dodson intervenors do not challenge the plan's provisions regarding the racial make-up of

the promotions panels. Dodson intervenors' objections, filed on November 7, 1994, at 6.

**25.** Dodson intervenors' objections, filed on November 7, 1994, at 18.

**26.** *Id.* at 9.

This objection by the intervenors is meritless.

### v.

■ The Dodson intervenors object "on due process (fairness) grounds" to the proposed permanent promotion plan.[27] First, it fails to provide a hearing for those persons whom the Montgomery County Sheriff's Department or the Montgomery City–County Personnel Board would seek to disqualify as candidates for promotion because, for example, the candidate's application was not received on time or the candidate failed to meet minimum qualifications, Plan § 5.04.[28] Second, it fails to provide for an appeal from such disqualification.[29] And, third, it fails to provide notice to candidates of their rankings by the promotions panels.[30] The court assumes that the intervenors rest these challenges on the due process clause of the fourteenth amendment to the United States Constitution.

Whether the proposed plan should provide the above is outside the scope of this litigation. This court does not sit as a roving court of equity positioned to remedy all imaginable legal flaws in the plan. The only issue for this court is whether the plan violates Title VII or the equal protection clause, or is otherwise against public policy. If, indeed, an officer in the Montgomery County Sheriff's Department is entitled to notice of his or her ranking by a promotions panel or is entitled to a hearing and an appeal before he or she may be disqualified, then the affected officer may file a separate lawsuit raising such a claim. Nothing in this litigation should be understood as resolving, or even addressing, such due process issues, or as prohibiting these issues from being raised in another lawsuit.

### vi.

■ The Dodson intervenors claim that many aspects of the proposed permanent promotion plan—for example, how bands are established, how weights are assigned to various selection devices, how test questions are eliminated, how tapped KSAs are chosen and measured, how scores from the oral interviews are determined, how, as part of the selection process from within bands, untapped KSAs are chosen and measured, and how promotions panels evaluate candidates based on the untapped KSAs—are essentially not as psychometrically sound as the promotion plan the intervenors themselves have fashioned and submitted.[31] Again, the focus of this court is narrow: the only issue is whether the plan submitted by the Montgomery County Sheriff's Department, along with other parties, violates Title VII or the equal protection clause, or is otherwise against public policy. The court does not sit to judge, in general, whether one promotion plan is better than another.

### vii.

■ The Dodson intervenors complain, finally, that the proposed permanent promotion plan contains no "sunset" provision for its application.[32] The plan limits its provision regarding "adverse impact" to two years. Plan § 6.03(d). There is no reason to limit the operation of the promotion plan otherwise.

■ The court, however, believes that it is now time that the parties contemplate an end, in the near future, to this litigation to the extent it involves the Montgomery County Sheriff's Department and its officials. "Otherwise," as this court has previously stated, "these two cases will give a literal meaning to the figurative comment this court made a number of years ago, in another lawsuit, that 'Unlike old soldiers, cases such as the one now before the Court not only never die, they never fade away.'" *United States v. City of Montgomery*, 775 F.Supp. 1450, 1460 (M.D.Ala.1991) (quoting *United States v. Frazer*, 1976 WL 729, 14 Empl. Prac.Dec. (CCH) ¶ 7599 at 4929 (M.D.Ala. 1976)). A court's end purpose in institutional

27. *Id.* at 16.

28. *Id.*

29. *Id.*

30. *Id.* at 5.

31. *Id.* at 6, 10–18.

32. *Id.* at 19–20.

litigation, such as this, is to remedy the violation and then to restore to local or state authorities complete control of the institution operating in compliance with federal law. *Missouri v. Jenkins,* —— U.S. ——, ——, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995); *Freeman v. Pitts,* 503 U.S. 467, 489, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992). The court will therefore require that the parties show cause as to why this court should not impose as a requirement, separate from the proposed permanent promotion plan, that all claims against the department and its officials will be dismissed on December 31, 1997, unless on or before that date a party to this litigation requests in writing that the litigation be extended.

An appropriate judgment will be entered.

### *JUDGMENT*

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the joint motion for approval of a proposed permanent promotion plan for the ranks of sergeant, lieutenant, and captain in both the law enforcement and corrections divisions of the Montgomery County Sheriff's Department, filed by the Sims plaintiffs, the Scott intervenors, the Williams plaintiffs, and the defendants on October 20, 1994, is granted;

(2) That all objections to said jointly submitted proposed permanent promotion plan are overruled;

(3) That said jointly submitted proposed permanent promotion plan, a copy of which is attached to this judgment, is approved;

(4) That all provisions in prior orders that require or authorize the Montgomery County Sheriff's Department to avoid "adverse impact" on the basis of race or sex in promotions for the ranks of sergeant, lieutenant, and captain in both the law enforcement and corrections divisions of the department are dissolved except as provided in the jointly submitted proposed permanent promotion plan; and

(5) That any interim plan for promotions for the ranks of sergeant, lieutenant, and captain in both the law enforcement and corrections divisions of the Montgomery County Sheriff's Department is dissolved.

It is further ORDERED that the defendants' motion for approval of a proposed permanent promotion plan, filed on January 5, 1994, and amended on January 21, 1994, is denied as moot.

It is further ORDERED that all parties show cause, if any there be, in writing by July 17, 1995, as to why this court should not impose as a requirement, separate from the jointly submitted and court-approved proposed permanent promotion plan, that all claims against the department and its officials will be dismissed on December 31, 1997, unless on or before said date a party to this litigation requests in writing that the litigation be extended.

It is further ORDERED that costs are taxed against the defendants, for which execution may issue.

### APPENDIX

### MONTGOMERY COUNTY SHERIFF'S DEPARTMENT

### PROMOTIONS PLAN AND POLICIES

It is the policy of the Montgomery County Sheriff's Department ("the Department") to promote employees without discrimination on account of race, color, national origin, gender, age, religion, or disability. In furtherance of that policy and in compliance with the federal court decrees which have expressly prohibited discrimination against African Americans and females, the Department adopts this *"Promotions Plan and Policies"* ("the Plan") for its law enforcement officers.

Unless specifically preserved herein, all previously issued promotional plans, orders, policies and procedures are hereby superseded. The Plan shall also supersede the promotions policies set forth in Section 3.60 of the Department's *Manual of Policies and Procedures.* Pending the promulgation of a revised *Manual of Policies and Procedures,* the Plan shall be considered a supplement to the Manual and shall replace Section 3.60.

Promotions shall be made in accordance with the professionally developed and job-

related selection guidelines and procedures outlined herein. All promotion procedures will be implemented consistently and fairly to all eligible applicants.

---

## 1.0 EFFECTIVE DATE

The Plan shall be effective on January 1, 1995, following its approval by the Court in the employment discrimination litigation pending in the United States District Court for the Middle District of Alabama as Civil Action Nos. 3708–N and 82–717–N. It shall govern all promotions made on or after January 1, 1995.

With respect to promotions based on unexpired promotional registers established prior to January 1, 1995, the Plan shall apply to the extent that selections from within bands shall be governed by the procedures set forth herein at Section 6.03.

## 2.0 DEFINITIONS

The following words, terms and phrases, when used herein, shall have the meanings set forth in this section, unless the context clearly indicates a different meaning:

(a) *Adverse Impact:* a legal standard which refers to a substantially different selection rate for different subgroups (e.g., race or gender) as defined by a test of statistical significance or the Uniform Guidelines' four-fifths rule.

(b) *Applicant*: a person who applies for a vacancy.

(c) *Appointing Authority*: the Montgomery County Sheriff.

(d) *Bands/Banding*: a grouping of a range of scores in which candidates are considered to be equally qualified with respect to the knowledge, skills, and abilities measured by a selection procedure.

Banding also includes a certification of candidates for which no selection procedure is required because the number of eligible candidates is fewer than six.

(e) *Candidate*: an applicant who satisfies minimum qualifications to participate in a selection procedure.

(f) *Certify/certification*: the act of supplying the appointing authority with the names of applicants from which the appointing authority may fill promotional vacancies.

(g) *Eligible*: a person who is on an active re-employment or promotional employment list and has rights under this Plan to be certified for appointment.

(h) *Expert/expert consultant:* the professionals charged with responsibility for evaluating, developing, and recommending personnel practices, programs and procedures for the Montgomery County Sheriff's Department in accordance with federal regulations, professional guidelines and standards, and applicable court decrees.

The current expert/expert consultants are the Center for Business and Economic Development of Auburn University at Montgomery (AUM), directed by John G. Veres, III, Ph.D. and the Montgomery City–County Personnel Department (Personnel Department).

(i) *Promotion*: a change of employment from a position of one class to a position of another class which has a higher maximum salary rate.

(j) *Promotional Register*: a list of eligibles from which certifications are made.

(k) *Selection Procedure*: a job-related promotions test developed from a professionally administered job analysis for use in the selection of candidates for promotions. Selection procedures may include, but shall not be limited to, one or more of the following: multiple choice written test; structured oral interview; role play/job simulation; writing sample.

(1) *Vacancy:* a position duly created, with funds provided for payment of a salary, which is not occupied, and for which a valid request has been received by the Personnel Department.

## 3.0 APPLICABILITY TO EMPLOYEES

This Plan governs only the Department's law enforcement officers, for promotion to the following ranks:

*Law Enforcement Division*

Deputy Sheriff Sergeant

Deputy Sheriff Lieutenant

Deputy Sheriff Captain

*Corrections Division*

Corrections Officer Sergeant

Corrections Officer Lieutenant

Corrections Officer Captain

## 4.0 ELIGIBILITY FOR PROMOTION

### 4.01 *Law Enforcement Division*

To be eligible to apply for participation in the selection procedures for promotion to **Deputy Sheriff Sergeant,** an employee must have completed twenty (20) months of continuous service in the rank of Deputy Sheriff, beginning on the date the employee is classified as a Deputy Sheriff, not including the time in service as a Deputy Sheriff Trainee, and ending on the closing date for applications specified in the notice of the selection procedures.

To be eligible to apply for participation in the selection procedures for promotion to **Deputy Sheriff Lieutenant,** an employee must have completed one year of continuous service in the rank of Deputy Sheriff Sergeant, beginning on the date the employee is classified as a Deputy Sheriff Sergeant, and ending on the closing date for applications specified in the notice of the selection procedures.

To be eligible to apply for participation in the selection procedures for promotion to **Deputy Sheriff Captain,** an employee must have completed one year of continuous service in the rank of Deputy Sheriff Lieutenant, beginning on the date the employee is classified as a Deputy Sheriff Lieutenant, and ending on the closing date for applications specified in the notice of the selection procedures.

### 4.02 *Corrections Division*

To be eligible to apply for participation in the selection procedures for promotion to **Corrections Officer Sergeant,** an employee must have completed twenty (20) months of continuous service in the rank of Corrections Officer, beginning on the date the employee is classified as a Corrections Officer, not including the time in service as a Corrections Officer Trainee, and ending on the closing date for applications specified in the notice of the selection procedures.

To be eligible to apply for participation in the selection procedures for promotion to **Corrections Officer Lieutenant,** an employee must have completed one year of continuous service in the rank of Corrections Officer Sergeant, beginning on the date the employee is classified as a Corrections Officer Sergeant, and ending on the closing date for applications specified in the notice of the selection procedures.

To be eligible to apply for participation in the selection procedures for promotion to **Corrections Officer Captain,** an employee must have completed one year of continuous service in the rank of Corrections Officer Lieutenant, beginning on the date the employee is classified as a Corrections Officer Lieutenant, and ending on the closing date for applications specified in the notice of the selection procedures.

## 5.0 SELECTION PROCEDURES

### 5.01 *Development and Validation*

Job-related selection procedures will be used in making promotions to the ranks of "sergeant", "lieutenant", and "captain" in each Division. Such procedures are developed in accordance with professional standards and legal guidelines and relate to the knowledge, skills, abilities, capacities, and fitness of a candidate to discharge effectively and efficiently the duties of the job to be filled.

For each promotional vacancy for which there are fewer than six (6) eligible candidates, the selection procedures shall be based on procedures administered in connection with the Promotions Panel described herein at Section 6.03.

### 5.02 *Notice of Promotional Vacancy and Selection Procedures*

At least 120 days prior to the scheduled date for administering the selection procedure for a promotional vacancy, the Personnel Department and the Expert will prepare

a "Promotional Announcement", which shall include the following:

- the rank for which there is a vacancy
- the official posting date of the announcement
- the final date for filing an application
- recommended study materials
- date and location of pre-test orientation
- description of the selection procedure and weights of each component, as appropriate
- other pertinent and helpful information

The Personnel Department will provide, and the Appointing Authority will post, the Promotional Announcement at the designated locations in the Department and its satellite stations. Notices shall remain posted until the application period expires. Candidates shall receive reasonable notice of the test dates and locations.

### 5.03 *Filing of Applications*

The Promotional Announcement will state a final date for filing an application which shall be, at a minimum, fifteen (15) working days from the date the Promotional Announcement is issued. Applications must be completely filled out and received in the office of the Personnel Department, which is presently located in City Hall, first floor, room 121–0.

Applications must be received in the Personnel Department not later than 5:00 p.m. on the final date specified in the Promotional Announcement for filing. Applications may be delivered in person, by hand-mail, by the U.S. postal service or any other mail delivery service, or by facsimile, if followed by delivery of an application containing an original signature.

### 5.04 *Disqualification from Competition*

The Personnel Department and/or Expert shall disqualify an applicant or candidate from competition upon determination that:

(a) The application was not received by the filing deadline; or

(b) The applicant fails to meet the minimum qualifications specified in the promotional announcement; or

(c) The candidate fails to appear at the announced time and place for testing; or

(d) The candidate violates test security by failing to follow instructions during test administration, including, but not limited to, such actions as talking with another candidate after having been advised not to talk, attempting to take testing materials from the test location after having been told not to take materials, leaving the testing room, holding room or other test location without permission, providing test information to other candidates.

The Personnel Department will provide written notification of the disqualification and the reason for disqualification to the applicant or candidate within five (5) days from the determination of the disqualifying circumstance.

The Personnel Department may not exercise discretion in waiving these requirements for qualification.

As relates to subsections (a) and (c) only, the Personnel Department may exercise such discretion as may be required by law in connection with military personnel called to active duty.

### 5.05 *Rating; Banding of scores*

All components of the selection procedures administered for each promotional vacancy shall be scored and rated in accordance with professional testing standards. Written tests shall be scored objectively while structured oral interviews, role plays, writing samples, and other similar selection procedures, shall be scored by panels of professionally trained assessors.

Applicants will be grouped based on a range of scores for selection of any candidate from within the most qualified range. In this process, known as "banding", all candidates within a given band are considered to be equally qualified with respect to the knowledge, skills and abilities measured by the selection procedures utilized for a particular promotion.

The width of the bands is based on the "standard error of the difference" (SED) of the component or components, appropriately weighted to reflect the percent contribution

of each component to the final score. "Standard error of the difference" is a measure of the accuracy of the promotions procedure which takes into account the range of scores on the procedures and the reliability of those procedures. The more reliable the procedures, the smaller the SED, and consequently, the smaller the band.

Subject to the restrictions set forth at Section 6.03, the appointing authority selects any of the equally-qualified candidates for promotion, and exhausts the top-most band before considering candidates from lower bands.

### 5.06 *Notification of Results; Review*

Each candidate who competes in the selection procedures for promotion shall be given written notice of the results of each part of the selection procedure. The notice shall include the candidate's scores for each part and standing on the promotional register, or failure to qualify.

Candidates shall be notified of opportunities to review their performance with the test developers and to secure feedback designed to assist them in improving performance on future promotions procedures.

### 6.00 CERTIFICATION AND APPOINTMENT

#### 6.01 *Certified Promotions Register*

The Personnel Department shall provide to the appointing authority a certification of eligibles for selection to fill each promotional vacancy based on the selection procedures administered. If there are fewer than six (6) candidates eligible for promotion to a vacancy, the Personnel Department's certification shall include all eligible candidates without administration of any selection procedure.

#### 6.02 *Duration of the Promotions Register*

A Promotions register shall be valid for two (2) years from the date the register is established by the Personnel Department, or for such alternate period set by the expert/expert consultant, or until the register is exhausted, whichever occurs first.

A register is exhausted when all candidates have been promoted, offered promotion and declined, rejected for cause by the Sheriff, or have separated from employment with the Department.

#### 6.03 *Selection from within bands*

When the Personnel Department certifies qualified candidates for the Sheriff's selection from within the top band of equally-qualified candidates, or when the top band has been exhausted, from within the highest band, the following procedures shall govern.

(a) The Sheriff shall establish a "Promotions Panel" separately for the Corrections Division and the Enforcement Division, and each shall consist of not less than 3 and not more than 5 members. A panel will be established in the appropriate division whenever a promotional vacancy exists in that division for which the Sheriff has requested a certification from the Personnel Department.

These panels will consist of all Captains, but if the number of Captains in either division is insufficient to constitute a panel of the size designated by the Sheriff, the Sheriff shall appoint an additional member or members having a rank at least equivalent to the rank under consideration.

If a Promotions Panel does not include an African American or a female, the Sheriff shall have discretion to substitute or to add members—not to exceed a five-member Panel—in order to further the Department's continuing commitment to ensure fair representation of all races and genders on departmental panels; for this purpose, the Sheriff may select panel members outside the Division under consideration and/or outside the Department.

(b) Each Promotions Panel shall be provided a list of the candidates certified for promotion to the rank under consideration in its division. The panel shall assess each of the candidates certified for promotion, applying job-related criteria established by the expert consultant. The criteria will address two areas: (1) untapped knowledges, skills, and abilities (KSAs), and (2) work habits.

Untapped KSAs will be defined as those KSAs identified by the job analysis as important but untapped—due to measurement constraints—by the selection procedures used to establish the promotional registers. Work habits will include an assessment of attend-

ance, punctuality, compliance with departmental rules, and relationships with co-workers. Training by an expert will be provided to each panel on the rating procedures to be used in assessing untapped KSAs and work habits, and the expert shall also oversee the rating of candidates.

Each Promotions Panel shall render its evaluation independent of interference or influence from any individual or entity. To ensure that all candidates under consideration by the Promotions Panel are assessed fairly, objectively, and consistently, the Panel shall refer only to Personnel information and records supplied, or otherwise approved, by the expert/expert consultant.

(c) Within ten calendar days after completion of all interviews, the Promotions Panel shall provide to the Sheriff a rank-ordered list of the candidates certified for promotion. Within thirty days thereafter, the Sheriff shall make his selection(s) from the rank-ordered list and forward such selection(s) to the Personnel Department.

(d) For a period of two years from the effective date of the Promotions Plan, the Sheriff shall consider "adverse impact" data (only if the data permits statistically meaningful conclusions) when he makes his selection from the Promotions Panel's rank-ordered list of the candidates certified for promotion.

### 7.00 SEVERABILITY

If any provision of this Plan, or any application thereof to any person or circumstances, is held invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provisions or applications; to this end, the provisions of this Plan are declared to be severable.